STATE EX REL. HASKELL, ATTORNEY GENERAL, RELATOR, *v.* FAULDS, RESPONDENT.

[Submitted October 6, 1895.  Decided November 11, 1895.]

CONTEMPT—*Publication of proceedings of Court.*—The publication of an editorial referring to decisions of the supreme court in certain cases and charging the court with dealing out injustice in such cases and entering into a "dirty deal" in order to do so, constitutes a report of the proceedings of a court within subdivision 7, section 293 of the Penal Code, defining as a contempt "the publication of a false and grossly inaccurate report of the proceedings of any court."

SUPREME COURT—*Jurisdiction.*—The supreme court does not part with its jurisdiction over an appealed case until a remittitur has been issued returning the case to the district court. (*Kimpton* v. *Jubilee Placer Mining Co.*, 16 Mont. 379, cited.)

CONTEMPT—*Misdemeanor.*—Although the publication of a contemptuous report of the proceedings of a court is punishable as a misdemeanor, this does not deprive the court of the power to punish such act as a contempt.

CONTEMPT—*Constitutional Law.*—Section 10, Article III, of the constitution, providing "that no law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty," is not violated by subdivision 7 of section 293 of the Penal Code, making the publication of a false and grossly inaccurate report of the proceedings of any court punishable both as a contempt and as a misdemeanor. (*Territory* v. *Murray*, 7 Mont. 251, cited; *In re MacKnight*, 11 Mont. 126, distinguished.)

ORIGINAL PROCEEDING.   Attachment for contempt.

Statement of the case by the justice delivering the opinion.

On the 30th day of October last, the attorney general of the state filed in this court an affidavit, werein it is shown:  That there were then pending in this court three cases, entitled respectively,   "*The State of Montana* v. *David J. Whaley*," "*The State of Montana* v. *Clement P. Whaley*," and "*The State of Montana* v. *Matthew L. Whaley*" (16 Mont. 574), in which said cases the opinions of this court had been rendered and announced; but that no remittitur had been issued in either of said cases.   That J. R. Faulds, the respondent, is the editor, publisher, and proprietor of the *Northwest Tribune*, a weekly newspaper of general circulation, printed and published at Stevensville, Ravalli county, in this state.  That, on the 25th day of said month of October, the said Faulds did publish · and cause to be published at said town of Stevensville, among other things, the following false, malicious, contemptuous, and defamatory matter of and concerning the judges of the supreme court of the state, acting in their judicial capacity, which publication was a false and grossly inaccurate report of the proceedings of the supreme court in the three cases above mentioned:   "The supreme court of Montana, the highest tribunal of justice in the state, was the first to throw down the bars and deal out injustice to the people of Ravalli county.   The dirty deal is made the more obnoxious through the action of Governor Rickards in his reasons for granting the pardon."   That the same was done with the intent to hinder, embarrass, and defeat the administration of justice, and to insult and degrade the court, and to expose it and the members thereof to contempt.

Upon the filing of said affidavit a warrant of attachment was issued out of this court, and served upon the respondent, requiring him to show cause why he should not be adjudged guilty of contempt.   After filing a motion to strike out certain parts of the affidavit, which was overruled, the respondent filed a motion to quash the warrant of attachment upon, sub-

stantially, the following grounds: (1) The matters stated in the affidavit do not constitute a contempt. (2) It does not appear that, at the time of the publication of the matter stated in the affidavit, any of the cases referred to were then pending in court. (3) If the matter contained in the publication complained of is punishable at all, it is by criminal prosecution, and not in proceedings in contempt.

Without ruling upon this motion, and reserving a decision thereon, the court required the respondent to file an answer. The answer is a complete and absolute denial that the language set out in the affidavit was intended by the respondent to refer to the court or to the judges thereof, but was intended to refer to other persons and things involved in a controversy with other persons in the town and vicinity where the same was published. The respondent denies all intention to insult the court or bring it into obloquy or contempt by said publication. This answer is under oath. The motion to quash the writ, and the answer, will both be treated in the opinion.

*Henri J. Haskell,* Attorney General, for Relator.

*Wilbur F. Sanders,* for Respondent.

PEMBERTON, C. J.—This proceeding is based upon subdivision 7, § 293, of the Penal Code. Under this subdivision, "the publication of a false and grossly inaccurate report of the proceedings of any court" is recognized as a contempt of court, and the perpetrator thereof is declared to be guilty of a misdemeanor.

The first question that presents itself is this: Is the publication under discussion a report of the proceedings of this court in the cases referred to in the affidavit? We think this question must be answered in the affirmative. It refers to the cases, tells what was done by this court, and then says how and why it was done, in language contained in the statement. So that, if the publication constitutes a report of the proceedings of this court in the cases referred to, and is "false and grossly inaccurate," it amounted to and was a contempt of

court. The language quoted in the statement is a part of a long editorial, in which the action of the court in its proceedings in the cases mentioned is referred to several times. We think any person, whether professional or layman, could come to no other conclusion, from reading the article, than that this court and its proceedings were referred to in the particular language alleged to be contemptuous. Nor do we have any doubt that the language constitutes contempt under the provisions of the Code cited above. It not only charges this court with dealing out injustice, but it alleges that it entered into a "dirty deal" for the purpose of doing so. This is a clear charge of improper, impure, or corrupt motive. We think this sufficient to say in relation to respondent's first ground for quashing the writ in this case.

The respondent, as a second ground for quashing the writ in the case, contends that it does not appear that, at the time of the publication in question, any of the cases referred to therein were pending before this court. In this the respondent is in error, we think. The affidavit states that no remittitur had been issued by this court in any of the cases mentioned therein. This court obtained jurisdiction of the cases by appeal. It did not part with that jurisdiction as long as no remittitur had been issued returning the case to the district court. In *Kimpton* v. *Jubilee Placer Mining Co.*, 16 Mont. 379, on petition for rehearing, this court held that it had jurisdiction until the remittitur had been issued. (See authorities cited in that opinion. See, also, Haynes, New Trials & App. § 293, and authorities cited.)

This proceeding having been instituted under the section of the Penal Code cited above, would it make any difference if the remittiturs had been issued in the cases? By the provisions of the Code, the contempt consists in publishing a "false and grossly inaccurate report of the proceedings," of the court. How could any report be published of the proceedings in question of the court until after the proceedings had been had, or of any opinion or decision of the court until such opinion or decision had been rendered?

Although we deem it unnecessary to determine this question, we think it not inappropriate to quote in this connection what is said in *State* v. *Morrill*, 16 Ark. 384, where this question was raised. The court says:

"If an ignorant or impolite man stalks into a courthouse with his hat on, or makes a noise about the door, or disobeys process, all agree that he may be punished for contempt, but if a man has an important case pending in court, and, willing to resort to desperate measures to succeed, publishes, on the eve of the trial, a libel, alleging that the judge has been bribed to charge the jury against him, and that all the witnesses who are to appear on behalf of the opposing party have been corrupted, and are unworthy of credit, it is no contempt, and the judge must labor under the embarrassment of sitting in the case, under such circumstances, with his mouth closed ! Or if a judgment is rendered against a man, as soon as the judge leaves the bench, he is met at the door, insulted and assaulted by the party, in consequence of his decision, and then a publication is made in a newspaper charging him with corruption in rendering the judgment, and calling upon the community to disregard and resist its execution, and yet this is no contempt ! "

The respondent, as a third ground for quashing the writ, contends that, if the matter contained in the publication is punishable at all, it is by criminal prosecution, and not in proceedings in contempt. This contention is evidently urged upon the theory that the cases referred to in the affidavit and publication were not pending in this court at the date of the publication of the alleged contemptuous matter. But it becomes appropriate to notice this contention further, for the reason that, in their argument, the able counsel of respondent dealt eloquently and at length upon the constitutional liberty of the press, which they claim is involved in the case. This court is not less mindful of the importance and absolute necessity of maintaining the freedom of the public press than the eloquent counsel themselves, if we would preserve the liberties of the people and republican institutions and government in this country.

Section 10, Article III, of the constitution of this state pro-
vides " that no law shall be passed impairing the freedom of
speech; every person shall be free to speak, write or publish
whatever he will on any subject, being responsible for all
abuse of that liberty."

While this section of the constitution secures the largest
liberty to the press, it also imposes responsibilities. It is a
statute of liberty, not of " licentious scandal." The liberty
of the press is one thing; the " abuse of that liberty " is quite
another. (*People* v. *Stapleton* (Colo. Sup.) 33 Pac. 167.)

We cannot better express our views of this most important
subject than by appropriating the language of the court in
*State* v. *Morrill*, quoted above,—an able and exhaustive opin-
ion on the freedom of the press in this country. The court in
that case, after speaking of the limited powers of the legisla-
ture to punish contempt, says :

" But the fact that the convention which framed the consti-
tution had the subject of contempts before them, placed a limi-
tation upon the power of the two houses to punish contempts,
but did not think proper to place any such limitation upon the
power of the courts, warrants the conclusion that the courts
were left to exercise such common law powers on the subject
as, in their sound discretion, might be found necessary to pre-
serve their authority, and enforce their legal process, orders,
judgments and decrees, without which they could not answer
the purposes of their creation. And there is a good reason
why the framers of the constitution might well have made this
distinction. The legislature is a political body. If its pro-
ceedings and the conduct and motives of its members are un-
justly assailed by libelous publications, they may defend their
official conduct, and repel attacks through the press, and upon
the ' stump;' but it is not the usage of the country, nor would
it comport with the dignity of judicial stations, for judges to
resort to newspapers or the public forum in defense of the in-
tegrity of their decisions, etc., and it would be an unwise
policy that would drive them to such a course. Moreover,
the fact that judges of this country, or the one from which we

have derived the great body of our laws and the forms of our judicial proceedings, have in the rarest instances abused the power of punishing contempts, furnishes an additional reason why the framers of the constitution did not deem it necessary to make any express limitation upon the power.   The delicacy of the power is a safeguard against its abuse in the mind of any man worthy of a seat upon the bench.   The counsel for the defense supposed that the power of the courts to punish, as for contempt, the publication of libels upon their proceed ings, was cut off by the seventh section of the bill of rights,. which is in these words :   ' That printing presses shall be free to every person; and no law shall ever be made to restrain the rights thereof.   The free communication of thoughts and opin ions is one of the invaluable rights of man; and every citizen may freely speak, write and print on any subject,—being re sponsible for the abuse of that liberty.'   The last clause of the section, ' being responsible for the abuse of that liberty,' is an answer to the argument of the learned counsel.  It is a well-known fact that the bench and bar have been, in this and all other. countries where the law has existed as a distinct profes sion, the ablest and most zealous advocates of liberal institu tions, the freedom of conscience and the liberty of the press; and none have guarded more watchfully the encroachments of power, on the one hand, or deprecated more earnestly tenden cies to lawless anarchy and licentiousness, on the other.   The freedom of the press, therefore, has nothing to fear from the bench in this state.   No attempt has ever been made, and, we may venture to say, never will be, to interfere with its legiti mate province, on the part of the judiciary, by the exercise of the power to punish contempts.   The object of the clause in the bill of rights above quoted is known to every well informed man.   Although the press is now almost as free in England as it is in this country, yet the time was, in bygone ages, when the ministers of the crown possessed the power to lay their hand upon it, and hush its voice, when deemed necessary to subserve political purposes.   A similar clause has been in serted in all the American constitutions, to guard the press

against the trammels of political power, and secure to the whole people a full and free discussion of public affairs. Any citizen has the right to publish the proceedings and decisions of this court, and, if he deem it necessary for the public good, to comment upon them freely, discuss their correctness, the fitness or unfitness of the judges for their stations, and the fidelity with which they perform the important public trusts reposed in them; but he has no right to attempt, by defamatory publications, to degrade the tribunal, destroy public confidence in it, and dispose the community to disregard and set at naught its orders, judgments and decrees. Such publications are an abuse of the liberty of the press, and tend to sap the very foundation of good order and well-being in society, by obstructing the course of justice. If a judge is really corrupt and unworthy the station which he holds, the constitution has provided an ample remedy by impeachment or address, where he can meet his accuser face to face, and his conduct may undergo a full investigation. The liberty of the press is one thing, and licentious scandal is another. The constitution guarantees to every man the right to acquire and hold property, by all lawful means; but this furnishes no justification to a man to rob his neighbor of his lands or goods. The remarks of Chief Justice McKean in *Republica* v. *Oswald*, 1 Dall. 319, above referred to, are in point. He said: 'What, then, is the meaning of the bill of rights and the constitution of Pennsylvania when they declare "that the freedom of the press shall not be restrained, and that the printing press shall be free to every person who undertakes to examine the proceedings of the legislature, or any part of the government?" However ingenuity may torture the expressions, there can be little doubt of the just sense of these sections. They give to every citizen a right of investigating the conduct of those who are intrusted with the public business, and they effectually preclude any attempt to fetter the press by the institution of a licenser. * * * But is there anything in the language of the constitution (much less in its spirit and intention) which authorizes one man to impute crimes to another, for which the

law has provided the mode of trial and the degree of punishment? Can it be presumed that the slanderous words, which, when spoken to a few individuals, would expose the speaker to punishment, become sacred, by the authority of the constitution, when delivered to the public through the more permanent and diffusive medium of the press? * * * The true liberty of the press is amply secured by permitting every man to publish his opinions; but it is due to the peace and dignity of society to inquire into the motives of such publications, and to distinguish between those which are meant for use and reformation, and with an eye solely to the public good, and those which are intended merely to delude and defame. To the latter description it is impossible that any good government should afford protection and impunity.' The argument of counsel that the constitution and laws having provided for the punishment of libels by indictment renders it wholly unnecessary for the courts, in any instance, to treat them as contempts, as well remarked by the attorney general, if it proves anything, proves too much; because, if a man resist the process of a court, or enter the courthouse, and assault the presiding judge, he may be punished by indictment therefor, and yet no one questions the power and duty of the court to punish such acts as contempts."

And in this case it will be observed that although such matters may be crimes, and punishable as such, still this does not deprive the courts of the power to punish such acts as contempts. As being in harmony with the views expressed in *State* v. *Morrill*, we cite *People* v. *Stapleton* (Colo. Sup.) 33 Pac. 167, and *State* v. *Frew*, 24 W. Va. 416. Authorities to the same effect might be multiplied to any extent. The views herein expressed are in harmony with the decision of this court in *Territory* v. *Murray*, 7 Mont. 251, 15 Pac. 145, in which case the distinguished counsel for this respondent appeared as the friend of the court. The case at bar is distinguished from *In re MacKnight* 11 Mont. 126, 27 Pac. 336, for the reason that the law of contempts has been changed in this state since that decision. The law upon which this proceeding is based was

not in existence when that case was tried. It cannot therefore govern in this case.

Counsel for respondent have cited many authorities to the effect that courts have no authority to punish as contempts publications of newspapers, however contemptuous, and even libelous, they may be, if they are published of and concerning cases and proceedings that are not pending in court. But these authorities are not applicable or pertinent, since we hold that the cases referred to in the publication under discussion were pending in this court at the date thereof, and, besides, this opinion is confined to the determination of the question whether the publication under discussion constitutes a con-tempt of court, under the section of the Penal Code under which this proceeding was instituted. Having fully considered this case in this light and from this standpoint, we are of the opinion that the publication mentioned in the affidavit consti-tutes a contempt of court.

This brings us to a consideration of the answer of respond-ent, in which he denies all intention to insult this court or bring it into contempt by said publication, and in which he as-serts that the publication was intended to apply to others, and not to this court in any respect whatever. Under like circum-stances, in *People* v. *Stapleton*, cited above, the court, after holding Stapleton guilty of contempt, accepted his sworn an-swer that he did not intend to insult or bring the court into contempt, as a sufficient ground for refraining from inflicting other punishment than the payment of costs. In the Morrill case, cited above, the same action was taken by the court, ex-cept that the court did not tax the costs against Morrill. We think it entirely within our discretion whether we will inflict punishment or not in this case. We have no desire to oppress the respondent. We understand and fully appreciate the deli-cate and unenviable position of this court in this peculiar case, as we are, in a sense, trying a matter that involves an offense against our own tribunal. We regret that we have felt called upon by a sense of duty to proceed in this matter at all. Only the belief that it was our duty to defend the court and its pro-

ceedings from unwarrantable, contemptuous, and calumnious attack has inspired and moved us in the matter. Having, therefore, no shadow of a desire to oppress or punish the respondent, even though he be guilty as charged, we are willing, in this instance, to accept his sworn answer and explanation of his conduct as true, and order that he be discharged.

The writ is ordered vacated, and the respondent discharged.

*Writ vacated.*

DE WITT and HUNT, JJ., concur.