OTT, Appellant, vs. BORING, Executor, Respondent.

*January 31—April 30, 1907.*

(1–7) *Contracts: For services: Acceptance: Partnership: Construction: Limitations: When cause of action accrues: Demand of performance: Laches: Estates of decedents.* (8–11) *Appeal: When jurisdiction of supreme court terminates: Remitting record: Motions, when must be made.*

1. Defendant's testator, one P., having a stock of dry goods worth about $10,000, proposed to plaintiff that if the latter would go with him to another city where he intended to establish a dry goods business, and would remain with him until he should be able to draw from the concern $10,000, besides "keeping the stock up" and paying expenses, he would pay plaintiff $15 per week, and when he should be able to draw from the business as aforesaid he would give plaintiff a one-fourth interest in the store, this being intended as additional pay, and plaintiff being expected to use his best endeavor to "make the store the greatest success possible." Plaintiff at once commenced, and until P.'s death continued, to comply on his part with the terms of the proposal. *Held,* sufficient to show that plaintiff accepted the proposal as a whole and not merely as to the weekly compensation.

2. No partnership *in præsenti* was created by such proposal and its acceptance.

3. By the phrase "keeping the stock up," in the contract, was meant the maintenance of such a volume and variety of merchandise as would best promote the ultimate purpose of making the store the greatest success possible.

4. Not until P., in the exercise of honest and reasonable judgment, deemed that he was able to draw $10,000 from the concern, consistently with keeping the most advisable volume of business,

would plaintiff have the right, under the contract, to demand the transfer of a one-fourth interest.

5. The fact that for about seventeen years after the making of the contract, and until his death, P. refrained from drawing the $10,000, and kept it in the business to enable the advancement and increase thereof, shows conclusively, as against him and his personal representatives, that the time did not come during his life when he was able to withdraw said sum and "keep the stock up," in the contractual sense of those words; hence that no cause of action upon the contract or for breach of it arose in his lifetime, against which any statute of limitation ran.

6. Until a demand by the plaintiff and refusal by P. to perform the contract according to its terms, or until repudiation of the agreement by P., no cause of action at law for money could accrue to the plaintiff; and the statute of limitations would not begin to run until the cause of action had accrued.

7. Plaintiff's failure to demand transfer to him of a one-fourth interest in the business during P.'s lifetime,—he having no reason to suppose that P. was acting otherwise than in good faith in continuing to postpone the time for withdrawal of the $10,000,—did not, under all the circumstances, constitute laches on the part of the plaintiff, precluding his recovery of the value of said interest after P.'s death.

8. When the record upon an appeal to the supreme court has been regularly transmitted to and filed with the court from which it originally came, the jurisdiction of the supreme court over the cause, as also to vacate or modify its own judgment, is at an end.

9. Under sec. 3071, Stats. (1898), it is the duty of the clerk of the supreme court to remit the papers in a case to the trial court within sixty days after the decision of the appeal, unless the court directs them to be retained to enable a party to move for a rehearing; and at the expiration of the sixty days if no such direction has been given, or whenever, without disobedience of any rule or order of the court, the clerk actually transmits the papers within the sixty days and they are filed in the court below, the jurisdiction of the supreme court is terminated.

10. The termination of the jurisdiction of the supreme court when the record has been transmitted as stated does not affect its power to correct the mere record of its judgment so as to make the record properly express such judgment.

11. Under Supreme Court Rule 42 all motions in the nature of a motion for a rehearing (as one to modify the judgment or mandate) are, like motions strictly for a rehearing, to be made within the thirty days during which, by Rule 37, in all cases the papers are directed to be retained.

APPEAL from a judgment of the circuit court for Ashland county: E. B. BELDEN, Judge. *Reversed.*

A claim filed in county court against the estate of Franklin J. Pool, deceased, there disallowed, and appealed to the circuit court, where the case was tried without a jury. It appeared, substantially without dispute, that in 1887 the deceased was engaged in business at Chicago as a dry goods merchant, and proposed removing his residence and business to Ashland, Wisconsin. He had a stock showing, by inventory, about $19,000, which, in conference with the plaintiff, was deemed to be worth approximately $10,000. He wrote the plaintiff on October 17, 1887, the following proposal:

"If you will go with me to Ashland and remain with me until I shall be able to draw from the concern the sum of ten thousand dollars besides keeping the stock up and paying personal and store expenses I will pay you fifteen dollars per week, and at the end of such time as I may be able to draw from the business as above stated, I will give you a one-fourth interest in the store. This is intended as additional pay, and you are expected to use your best endeavor at all times to make the store the greatest success possible."

Plaintiff accordingly went with deceased to Ashland, where a dry goods business was established in the name of F. J. Pool, and so conducted thenceforward to the time of Pool's death in July, 1904. Plaintiff drew, through all that time, compensation of $15 a week, except that, from some date in 1900, he was paid $17.31 a week—by what arrangement is not shown by reason of exclusion of plaintiff's testimony. He retained at all times the written proposal above stated, but there is no evidence that the subject was ever referred to between him and Pool. The business management was entirely with Pool, but plaintiff was distinguished from other clerks by being placed in command thereof whenever Pool was absent, and by having the duty generally of supervising all details arising in the sale of goods. He was also distinguished by the fact that he, alone, carried a key to the store, opened it in the morning and frequently fastened it up at night.

The business prospered, and was steadily enlarged in volume so that the net balance of book assets appearing by the inventory of 1889 was $29,000; in 1890 $37,000; in 1896 $19,000; in 1897 $71,000, and thence increased until at the time of Pool's death such balance was $119,000,—the small amount shown in 1896 being due to a fire which destroyed a large part of the stock on hand, for which, however, some $50,000 of insurance was collected and entered into the footing of the following year, 1897. Pool never withdrew any money from the business, except trifling amounts for current family expenses, which were charged to him on his books, and goods from the store taken and used by his family, for which no charge whatever was made, until about the year 1900, when he purchased some real estate in Ashland, not for the purposes of the business, and drew out $2,500 to pay therefor. After the recovery of the insurance money and in 1896 he loaned to or deposited with J. V. Farwell & Co., from whom he had always bought large quantities of goods, the sum of $15,000, entering the same as a charge on the books of the company and taking a demand due bill therefor, which was at all times treated as a business asset. This loan remained up to the time of his death.

Immediately after Pool's death plaintiff, by virtue of the opportunities of his position, was in apparent physical possession of the store and property, and notified the widow and adult son that he claimed to be in lawful possession by virtue of his one-quarter interest therein in pursuance of the writing above set forth. The attorneys for the respective parties conferred, and, in order to avoid unseemly clash and injury to the business, plaintiff surrendered up the manual possession to the representatives of Pool upon an agreement that no rights should be lost thereby, and thereupon presented claim to the county court which, as amended in pleading in the circuit court, is somewhat ambiguous. It is, apparently, a claim for $30,000 in money as the value of a one-quarter interest

in the entire assets of the business; such one quarter having been taken and being held by the representatives of Pool.

The court found that, as early as the inventory of 1889, Pool was able to draw from the concern the sum of $10,000, besides keeping the stock up and paying the store and personal expenses, and that more than six years before his death he did draw from the concern more than $10,000, referring to the loan to Farwell; and, as conclusion of law, that, if ever valid, the claim of the plaintiff is barred by the statute of limitations. In an opinion filed by the trial court some other grounds of disallowance are stated. Judgment was thereupon entered disallowing plaintiff's claim, from which he brings this appeal.

For the appellant there were briefs by *Sanborn, Lamoreux & Pray,* attorneys, and *Burr W. Jones* and *H. B. Walmsley,* of counsel, and oral argument by *Mr. Jones, Mr. F. B. Lamoreux,* and *Mr. Walmsley.*

For the respondent there was a brief by *Tomkins, Tomkins & Garvin,* and oral argument by *W. M. Tomkins.*

The following opinion was filed February 19, 1907:

Dodge, J. 1. The first position contended for by respondent, and adopted by trial court in an opinion filed, was to the effect that the evidence did not disclose an acceptance by the plaintiff of the written proposition quoted in the statement of facts, except as to the $15 per week compensation. The evidence on the subject is that the plaintiff received this proposition and, immediately thereafter, commenced and has continued to comply in all respects with the terms thereof on his part. From such facts no reasonable inference can be drawn that his intention was to accept only one part of the tendered compensation to him for such acts and to reject the other part. If the acts of the plaintiff in going to Ashland and associating himself with Mr. Pool were done in response to this proposition, they are plenary proof of the acceptance thereof ac-

cording to its terms, in the absence of any evidence to show a contrary purpose or understanding.

2. There is considerable confusion in the contentions made by different counsel for appellant as to the force and effect of the contract resulting from Mr. Pool's written proposition and plaintiff's acceptance thereof. At one moment they seem to contend that a partnership was immediately created thereby, and at another that it was a mere employment with a promise of additional payment at some indefinite date in the future; but whether that additional compensation was to be in the form of a partnership, or a mere transfer of title to one quarter of the property in the business, they are not very clear, nor, indeed, whether the contract was self-executing so that at some time an interest did, by force of law, vest in plaintiff, or some conveyance from Pool was necessary. After a careful examination of the writing in the light of the conduct of both parties, which certainly indicated complete concurrence by them in their understanding of their relations, we think it plain that no copartnership was originally formed between them. Mr. Pool's agreement was that some time in the future, in a certain contingency, "I will give you a one-quarter interest in the store," and the conduct of the parties at all times was consistent with the understanding that Mr. Pool was the owner of this business, exercising full autonomy and control thereover as owner, and that the time had never come when he had executed that promise by giving or transferring any part of the ownership thereof to the plaintiff. This view, of course, might not be inconsistent with the idea that some equitable rights had existed in the plaintiff at all times such as to enable him to protect against unreasonable or destructive conduct upon the part of Pool in managing the business so as to impair the probability that the time would ever come when plaintiff would be entitled to an interest, or would impair the value of that interest when such time did come, thus imposing a trust or fiduciary quality upon Pool's

title and management. This right might well exist without any actual ownership having yet been acquired. Suffice it to say that it is obvious that Mr. Pool's management never did at any time arouse disapproval by the plaintiff, but that he seems at all times to have had entire confidence in the wisdom and fairness thereof.

Having concluded that this was a contract that at some time Mr. Pool was to transfer to plaintiff a share either in the property or business, the next question of construction is when that duty was to be performed, so that if the transfer were not made Mr. Pool was in default and the plaintiff had a present complete cause of action. The proposition itself prescribed the time as "when I shall be able to withdraw from the concern the sum of $10,000 besides keeping the stock up." The view contended for by the respondent, and adopted by the trial court, was that, whenever that business had so increased that it was possible to withdraw $10,000 and leave a stock equal to that existing at the time of the contract, the agreement had been fully performed by the plaintiff and the transfer was due. We are persuaded that this is altogether too narrow a view of the situation. These parties, or rather Mr. Pool, was about to establish a business in Ashland, obviously with the expectation of a successful development thereof. Naturally, he hoped that the new city and surrounding country would grow in population, and, as phrased in the very proposition, the purpose of associating plaintiff with himself was "to make the store the greatest success possible." Obviously that was not to be accomplished by operating with a stock confined to some $10,000 in value, as at the start. It involved increasing varieties of goods, or departments, increasing volume of stock in each department, and, undoubtedly, the building up of a larger business. This hope and expectation is well illustrated by the course of events, fully understood by Pool and, at least in a degree, apparent to plaintiff, and obviously acquiesced in by both par-

ties as in accordance with their hope and purpose. In two years the net inventory worth of the business had been increased to $29,000, in three years to $37,000, and so onward, until in 1897 it reached $71,000 and in January, 1904, $119,000. Mr. Pool had deemed necessary, or at least advisable, for the proper development of the business to organize it on the lines of what is called a department store, so that, instead of the little establishment such as originally opened, the various kinds of goods were classified into departments, necessitating a department head to keep track of the demands and to see that every department was equipped with such supplies of goods in quantity and variety as would meet the demands of customers, and attract others, in competition with other dealers. We reach the conclusion that "keeping up the stock" in this contract was used and understood by both parties to mean the maintenance of such a volume and variety of merchandise as would most enhance the ultimate purpose of making the store "the greatest success possible," and that only when, consistently with the most effective promotion of that purpose, Mr. Pool could withdraw from the business $10,000, should he be under obligation to perform his promise to give the plaintiff the one-quarter interest.

Further than this, it is undisputed that the whole policy of the business rested with Mr. Pool and that such was the contemplation of the parties from the first. He decided what stocks to buy, what departments to establish, what credits to give, and what extent of indebtedness to incur. With him rested the judgment and discretion as to what were the needs of the business, and he, better than any one else, was capable of deciding when, consistently with the best policy, he was able to withdraw $10,000. Just this situation must have been in the contemplation of the parties, and just this autocracy would doubtless have been insisted on by Mr. Pool had any question arisen in regard to it. Plaintiff's confidence in Mr. Pool's ability, wisdom, and integrity is obvious through-

out. So that there can be little doubt that this contract, as between the parties, meant that not until Mr. Pool, in the exercise of honest and reasonable judgment, deemed that he was able to withdraw this sum, consistently with keeping up the most advisable volume of business, should plaintiff have the right to demand a transfer of one quarter thereof. Doubtless here, again, if difference of opinion arose and plaintiff felt that Mr. Pool was unreasonably delaying the consummation of his rights to share in the business, he could have made demand, and, if that demand were resisted, could have made application to a court to inquire whether the situation was such that Mr. Pool, in the reasonable exercise of his judgment, could say that it was still for the promotion of the purposes of their association to further continue building up the business with the retention of his original $10,000 capital. But, during all these years, the action of Pool in refraining from withdrawing such money and continuing it in the business to enable its further advancement and progress and in increasing the establishment was a most unambiguous assertion on his part that the time had not come when, under the terms of the contract, he was able to withdraw it and keep up the stock, and, so long as plaintiff was willing to assent to this view, it could not lie in the mouth of either Mr. Pool or his representatives to assert the contrary; especially as plaintiff was not informed at any time of the exact business conditions, although, of course, as a man of reasonable intelligence he knew that the business was largely expanding and the stock greatly increasing. He was not informed or shown the net results of the annual inventories and balance sheets; he was not informed to what extent the enlarged stock was offset by indebtedness, so that the safety of the business might be impaired by the withdrawal of so large a sum as $10,000, and meanwhile Mr. Pool continued, at least till 1900, within the limitation period, to receive *Ott's* services, necessarily increasing in amount and

value with the enlargement of the business, at the original weekly stipend, which it is difficult to believe would have been considered reasonable by either party but for the promised contingent compensation.

One event is claimed by the respondent to have marked a time when, beyond dispute, it is established that $10,000 could with safety have been withdrawn by Mr. Pool. That is a time when, after the stock had been largely destroyed by fire and after a considerable period of litigation, some $50,000 of insurance money was collected, and Mr. Pool in 1896 made a demand loan of $15,000 thereof to J. V. Farwell & Co., of Chicago, from whom he was accustomed to buy very largely the goods for the business, and it transpired that this credit was never drawn upon for the purchase of goods, but remained as a loan up to the time of Mr. Pool's death, interest being paid or credited periodically. This credit was never treated as withdrawn from the business. It was carried as an asset upon inventory and the recurring interest was applied from time to time upon bills of goods purchased from Farwell. The loan was made at a time when a wholly unusual quantity of money was on hand and when the question as to the extent to which the replacement of the stock destroyed by fire would demand the actual use of money was uncertain, and was a transaction with a concern upon whom obviously the business was dependent in large part for the supply of its merchandise under favorable circumstances. We are not prepared to say that, in Mr. Pool's judgment, such a sum as this might not well be used in that way in the business as promotive of its prosperity, and that his very act in treating it as still in and of the business instead of belonging to himself separate and apart therefrom was an assertion of the fact that he did not withdraw it and did not deem it best so to do.

We reach the conclusion that Mr. Pool's acts show conclusively, as against him and his representatives, that the time

never did come when he was able to withdraw $10,000 and
keep up the stock in the contractual sense of those words;
hence that no cause of action upon the contract or for breach
of it arose in his lifetime against which any statute of limita-
tions ran. When his death came, of course he could not
launch the contemplated partnership, if such were the con-
templation, and his representatives refused plaintiff a share
in the property, so that a money cause of action then arose
independently of whether any action to specifically perform
the contract might have been instituted. *Hill v. Palmer,*
56 Wis. 123, 129, 14 N. W. 20; *Treat v. Hiles,* 68 Wis.
344, 32 N. W. 517; *Seymour v. Cushway,* 100 Wis. 580,
593, 76 N. W. 769.

Much the same conclusion results from the consideration
that no money demand at law could accrue in plaintiff's
favor until a demand by him and refusal by Pool to perform
the contract according to its terms. Thereby, as we have ex-
pressed our view of its construction, Pool agreed, upon a
certain contingency, either to form a partnership with *Ott* or
to convey to him one fourth of the net assets of the business
after deducting $10,000. Any action upon the contract must
have sought enforcement of that particular duty. Money
liability could arise only upon refusal of a demand that it
be performed. *Martin v. Fox & Wis. Imp. Co.* 19 Wis. 552,
558; *Noonan v. Ilsley,* 21 Wis. 138, 143; *Linderman v. Dis-
brow,* 31 Wis. 465; *Bannister v. Patty's Ex'rs,* 35 Wis. 215.
Such demand and refusal were essential to the existence of a
cause of action for money, not merely a step in the remedy to
enforce it. Under our statute of limitations, especially sec.
4249, Stats. (1898), the time does not run until complete
accrual of the cause of action. Therefore, where some con-
dition precedent to the right of action exists, whether it be
a demand and refusal or some other act or contingency, the
cause of action does not accrue, nor the statute begin to run,
until that condition is performed. *Noonan v. Ilsley, supra;*

*State ex rel. G. B. & M. R. Co. v. Jennings,* 48 Wis. 549,
4 N. W. 641; *Tucker v. Grover,* 60 Wis. 240, 19 N. W. 62;
*Wells v. G. B. & M. C. Co.* 90 Wis. 442, 64 N. W. 69; *Lowe
v. Ring,* 106 Wis. 647, 82 N. W. 571; *Morey v. Fish Bros.
W. Co.* 108 Wis. 520, 84 N. W. 862; *Buttles v. De Baun,*
116 Wis. 323, 327, 93 N. W. 5; *Koelzer v. First Nat. Bank,*
125 Wis. 595, 104 N. W. 838; *Chew v. Baker's Adm'rs,* 4
Cranch C. C. 696, Fed. Cas. No. 2,663; *Eames v. Savage,*
14 Mass. 425; *Cole v. Wright,* 70 Ind. 179; *Quinn v. Gross,*
24 Oreg. 147, 33 Pac. 535; *Hill v. Haskin,* 42 Cal. 159;
*Martin v. Walker,* 68 Cal. 317, 9 Pac. 185; *Lincoln v. Pur-
cell,* 2 Head, 143.

It should perhaps be recognized, parenthetically, that the
universality of the above rule is subject to some exceptions
in certain jurisdictions, as, for example, where the defendant
has so unambiguously repudiated his duty as to show that
demand would be futile, or where the condition precedent
to suit is merely a step in the remedy and is wholly within
plaintiff's control (*Stillwater & St. P. R. Co. v. Stillwater,*
66 Minn. 176, 68 N. W. 836; *Schriber v. Richmond,* 73 Wis.
5, 40 N. W. 644), or the delay of the plaintiff in making
demand constitutes laches (*State ex rel. Slingerland v. Nor-
ton,* 59 Minn. 424, 61 N. W. 458). To what extent such
exceptions should be approved we need not declare, for the
instant case does not involve them. True, respondent claims
that laches, generally, ought to be ascribed to appellant, but
we can discover no facts which need have urged an ordina-
rily prudent and intelligent man to take action. As we have
concluded the parties must have understood this contract, the
initiative, at least to declare the period when wise business
policy justified withdrawal of $10,000, rested with Pool.
He, presumptively, had in mind the existence of his contract
with appellant, and the latter had no reason to suspect that
he was acting otherwise than fairly and honestly in continu-
ing the postponement of that time. Plaintiff was not in-

formed of the financial condition nor the credit of the business, or other elements bearing upon its needs. He was industriously performing his part of the contract, and Pool was accepting that service at a weekly stipend which, it is clear, the parties understood was meager for the laborious and responsible service rendered. Plaintiff's interests were enhanced by continuance of this capital in the business, and Pool's might have been if it yielded greater profits than it would earn interest if withdrawn, as to which he alone could judge. In all this situation we can see no reason why plaintiff should not yield to Pool's judgment and presumptive wish. The loan to Farwell is pressed on our attention again in this connection, but plaintiff is not shown to have had any sufficient knowledge of either the amount or the terms of that transaction as to suggest that it constituted any withdrawal of capital from the business or a declaration by Pool of termination of the pre-existing contract relations. The situation was one to emphasize a rule laid down in some cases, that, where all knowledge and control is with one party, the other may assume that conditions continue without change until informed to the contrary by the party having knowledge and power or election to change them. *Neilson v. Grignon,* 85 Wis. 550, 553, 55 N. W. 890; 19 Am. & Eng. Ency. of Law (2d ed.) 195; *Chew v. Baker's Adm'rs,* 4 Cranch C. C. 696, Fed. Cas. No. 2,663; *Quinn v. Gross,* 24 Oreg. 147, 33 Pac. 535; *Perry v. Smith,* 31 Kan. 423, 2 Pac. 784; *Cooper v. Cooper,* 132 Ill. 80, 23 N. E. 246; *King v. Rice,* 12 Cush. 161. We are persuaded that, under the circumstances of this case, the absence of any repudiation of the contract, or of plaintiff's rights thereunder, by word or act of Pool, and the absence of demand for execution of the contract, exclude the accrual of the present cause of action at any time prior to Pool's death so as to start the statute of limitations.

Our conclusion is that appellant has established his full

and complete performance of a contract according to the terms of the written proposal of October 17, 1887; that action for neither the share of the property thereby promised, nor for its equivalent in money, is barred by any statute of limitations, and that his recovery should be the money value of the one-fourth interest in the net money worth of the business at the time of presenting his claim in county court, less $7,500, being the balance of the $10,000 which Pool was entitled to withdraw; from which quarter should be deducted plaintiff's unexplained drafts from the business of $2.31 per week, in excess of the agreed $15, from some time in 1900; and that the balance should draw interest from the date of filing claim in county court. Since neither the net money value of the property of the business, nor the exact period of the excess weekly stipend, have been found by the trial court, and the evidence thereon is not clear, we deem it safer that those questions be considered and passed on in that court in the light of such further evidence thereon as may be presented.

*By the Court.*—Judgment reversed, and cause remanded for further proceedings in accordance with the foregoing opinion.

On motion to recall the record from the circuit court: The judgment of this court reversing the judgment below was rendered and entered February 19, 1907. On March 25, 1907, the plaintiff paid the clerk's fee, applied for the issue of a *remittitur,* and, accordingly, one was issued by the clerk and the record transmitted to the circuit court for Ashland county, where, according to the affidavits, it was filed on March 27th, and notice thereof given to the respondent on March 29th. At that time, and almost continuously from soon after the announcement of our decision, the defendant was busy obtaining affidavits of newly-discovered evidence as a basis for a motion to this court to modify the mandate

so as to permit the trial court to hear and pass upon a motion for a new trial. He served notice of such motion on April 2d, returnable April 12th, and filed the same in this court on April 3d. On April 1st he attempted to induce the clerk of the circuit court to return the record here, but failed, and on April 4th, conceiving that the presence of the record upon our files was necessary to the hearing of the said motion, he procured an order to show cause, returnable on April 9th, why the *remittitur,* record, and files should not be transmitted to the clerk of this court by the clerk of the circuit court for Ashland county, and why he should not have such other relief as might be just. On April 9th that motion was heard and is now to be decided.

*W. M. Tomkins* and *R. Sleight,* for the respondent, in support of the motion.

For the appellant, opposing the motion, there was a brief by *Sanborn, Lamoreux & Pray,* attorneys, and *Burr W. Jones,* of counsel, and oral argument by *Mr. F. B. Lamoreux* and *Mr. Jones.*

The following opinion was filed April 30, 1907:

DODGE, J. The salient facts are that the record remained here more than thirty days after the rendition of judgment; no application was made to this court for an order to retain it longer; it was remitted in less than sixty days, and the present motion to secure its return was made within the sixty days but after *remittitur* was filed in circuit court. The contention on the part of the plaintiff is that when the *remittitur* was regularly and in obedience to law transmitted to the circuit court the jurisdiction of this court over the cause, and consequently power over its judgment, terminated, and that it has no power either to act upon that judgment or to recall the record from the circuit court. The contention of the defendant is that, by virtue of the statute, our jurisdiction persists during a period of sixty days from

the judgment, and that the mere physical transmission of the record can have no effect upon it.

The question of the period of jurisdiction of purely appellate courts is a somewhat intangible one, and not to be decided always upon the same principles and considerations as those which regulate the jurisdiction of courts of general jurisdiction having the function not only of trial and judgment, but also of execution of the judgment. It seems from an examination of the authorities to be well-nigh unanimously declared that, in the absence of statute making a different provision, the jurisdiction of the appellate court over a given cause terminates whenever regularly, without inadvertence or fraud, it returns the record to the court of general jurisdiction. 2 Ency. Pl. & Pr. 359, 384; 2 Spelling, New Tr. & App. Prac. §§ 733, 734; Hayne, New Tr. & App. § 293; *Legg v. Overbagh,* 4 Wend. 188; cases collected in note, 21 Am. Dec. 118; *Delaplaine v. Bergen,* 7 Hill, 591; *Browder v. McArthur,* 7 Wheat. 58; *Peck v. Sanderson,* 18 How. 42; *Underhill v. Jericho,* 66 Vt. 183, 28 Atl. 879; *Sullivan v. Speights,* 14 S. C. 358; *Caldwell v. Bruggerman,* 8 Minn. 286; *Dempsey v. Billinghurst,* 7 S. Dak. 564, 64 N. W. 1124; *Leese v. Clark,* 20 Cal. 387; *Richardson v. Chicago P. & P. Co.* 135 Cal. 311, 67 Pac. 769; *Ward v. Springfield F. & M. Ins. Co.* 12 Wash. 631, 42 Pac. 119; *State ex rel. Haskell v. Faulds,* 17 Mont. 140, 42 Pac. 285. This apparently rests largely upon the doctrine that when that act is done the jurisdiction of the lower court, which has been suspended meanwhile, becomes re-established, and that both courts cannot have jurisdiction over the cause. Generally, too, it is held, in the absence of statute, that the power of an appellate court over its judgment, like that of courts generally, persists to the end of the term at which the judgment is rendered, and then absolutely terminates, except as it may be terminated earlier by the retransmission of the cause to the trial court. This court's power over its judgments seems

to have had no statutory regulation, either by way of limitation or extension, until 1860, when was enacted ch. 264, of which sec. 7 provided that the clerk of this court should remit the papers within thirty days after the judgment, "unless the supreme court, on application of either of the parties, shall direct them to be retained for the purpose of enabling such party to move for a rehearing." In 1878 "sixty days" was substituted for "thirty days" in that statute. Sec. 3071, Stats. (1898). After the passage of the law of 1860, and in 1874, the court gave general direction to its clerk to retain all records for the full thirty days, in absence of consent of parties to the contrary. See *Pringle v. Dunn*, 39 Wis. 435, 442. That direction later became crystallized in a rule which, prior to the revision of rules in 1906, was embodied in Rule XX, and is now embodied in Rule 37. The argument is that the intention of the legislature to be gleaned from the act of 1860 and its subsequent amendment is to enact that the jurisdiction of this court for the purposes of rehearing shall persist for a period of sixty days, and thereby is repudiated the previously well-established doctrine that it could not persist for any time after the transmission of the record. It will be at once observed that there is nothing in the words of the statute at all necessarily declaring such purpose. The statute, instead of ordering that the record shall remain or that jurisdiction shall persist during the sixty days, commands that the clerk shall remit the record within that sixty days. Hence, at any period after the rendition of the judgment, when he does remit, he acts in obedience to the statute, except as his duty is controlled by the rule of court prohibiting such transmission within the first thirty days. It is pretty clearly indicated that the legislature did not intend to abrogate or repudiate the doctrine of the necessity of the presence of the record for any motion for a rehearing, for they expressly authorized the court to keep the record here throughout said sixty days "for the purpose of en-

abling such party to move for a rehearing"—a very clear intimation of the supposition of the statute makers that such retention was necessary to enable such a motion. It should perhaps be remarked here, for clearness of terminology, that the words "motion for a rehearing," as used in this statute, and as we have thus far used them in this opinion, are to be construed broadly, as including any motion involving a setting aside or modification of the judgment actually rendered by the court, inclusive both of the motion for a rehearing, strictly so called, and those motions for the modification of a judgment, but not for a re-argument of the case, which have come to be termed motions in the nature of a motion for a rehearing. *Hocks v. Sprangers,* 113 Wis. 123, 89 N. W. 113.

It appearing, as we have already stated, that the statute in question can only receive the effect claimed for it by the defendant by some construction and not by the necessary force of its words, we turn to the construction which it has received from time to time by the court. From a pretty complete examination of all cases bearing upon it, it may be confidently asserted that in no case has the court entertained a motion for a rehearing, or one of that nature, after the record had passed to the court below, and in a number of cases the court has refused to entertain such a motion upon the ground clearly declared that the remission of the record had taken away its power to do so, although it is also true that in the great majority, if not in all, of such cases there may have been as another ground of loss of jurisdiction the expiration of the entire statutory period permitted for the retention of the record. The cases are numerous, but an express reference to a few will suffice. The first case is *Ogilvie v. Richardson,* 14 Wis. 151. At that time the statute required remission of the record within thirty days and the rules required a motion for rehearing to be made within twenty days. 3 Pin. 503. The decision was rendered July 10th, the record was remitted

August 2d, and motion for rehearing made October 19th, all at the same term of court. The court refused to entertain the motion for a rehearing, and said:

"Having been properly remitted to the circuit court, the questions involved are no longer before us; and we know of no way to get the cases here again, unless possibly it should be done by consent of the parties by setting aside the *remittitur* and returning the record. When cases have been once decided here, and regularly remitted after the time to move for a rehearing has expired, the function of this court with respect to those cases is exhausted."

It will be observed that the remission of the record was at the end of about twenty-two days, and it is declared "the cases were regularly remitted to the circuit court." The principle declared in the opinion would have as much excluded jurisdiction on August 3d as on October 19th. The next of significance is *Hopkins v. Gilman,* 23 Wis. 512. The record was transmitted about forty-five days after the decision. The application, apparently at the same term, was to recall the record and to allow a motion for a rehearing or modification. The court said:

"The *remittitur,* then, has properly issued, and the record has been regularly sent down to the court below. This court has no longer any control over the cause. It has lost jurisdiction over it. The court below has become repossessed of the cause. It has been decided a number of times by this court that when a *remittitur* has regularly issued, and the record has been sent down to the court below, this court has lost jurisdiction over the cause."

In *Pringle v. Dunn,* 39 Wis. 435, it was first definitely reasoned that the statute requiring the remission of the record within thirty days took away the previously existing inherent jurisdiction of the court over its judgments throughout the remainder of the term. Of course, this conclusion could have been reached only on the theory that the presence of the record is essential to jurisdiction, for there were no words in that statute declaring that the court's power over its judg-

Ott v. Boring, 131 Wis. 472.

ments should not persist beyond the thirty days; that had to be inferred from the command that the record should not remain. In *Trowbridge v. Sickler,* 48 Wis. 424, 428, 4 N. W. 563, it was declared:

"After the *remittitur* has been regularly sent to the court below, and actually filed with the clerk of such court, the supreme court then loses jurisdiction of the cause, and the court below only has jurisdiction therein."

The decision in *Hocks v. Sprangers,* 113 Wis. 123, 89 N. W. 113, much relied on by respondent, suggests no distinction, as to the period of jurisdiction, between strict motions for rehearing and motions for modification of our judgments; it merely declares that our then rules refusing to receive the former after thirty days did not exclude the latter class of motions during the term of our jurisdiction. Other cases having some significance upon this subject are *Estey v. Sheckler,* 36 Wis. 434; *Pierce v. Kelly,* 39 Wis. 568; *Bonin v. G. B. & M. R. Co.* 43 Wis. 210; *Krall v. Lull,* 46 Wis. 643, 1 N. W. 217; *Williams v. Williams,* 55 Wis. 300, 12 N. W. 465, 13 N. W. 274; *Patten P. Co. v. G. B. & M. C. Co.* 93 Wis. 283, 66 N. W. 601, 67 N. W. 432; *Hocks v. Sprangers, supra; Ledebuhr v. Wis. T. Co.* 115 Wis. 214, 217, 91 N. W. 1012. A somewhat analogous question, arising upon application for change of venue between circuit courts, was discussed in *Servatius v. Pickel,* 30 Wis. 507, where it was in effect held that the court making an order for such change had jurisdiction to modify it so long as the record remained, but would lose its power as soon as the record had been transmitted to another circuit court so as to vest jurisdiction there.

In the light of these decisions of our own court we cannot avoid the conviction that the rule has been thoroughly adopted that, when the record upon an appeal has been regularly transmitted to and filed with the court from which it originally came, this court's jurisdiction over the cause, as also to

vacate or modify its own judgment, is at an end; that the effect of the statute is to impose upon the clerk the duty, as an officer of the law, to transmit the record at any time within sixty days after the decision of the court, subject, within that period, to such order as the court may make in protection of proper opportunity to make motions for rehearing, whether strictly such or of that nature; so that, whenever the clerk, without disobedience of any such order or rule of court, does, as in this case, transmit the record within the sixty days, it is regularly and lawfully transmitted and the jurisdiction of this court is terminated. It should perhaps be said, for certainty, that this limitation upon the power of the court to grant rehearing or to vacate or modify its judgment has no relation to that other power, existent in all courts and at all times, to correct the mere record of the judgments which they render so as to make the record properly express that judgment. *Hill v. Hoover,* 5 Wis. 386; *Will of Cole,* 52 Wis. 591, 9 N. W. 664. Neither do we mean to suggest that the mere physical presence of the record in this court can, after the expiration of the sixty days, continue the jurisdiction of this court, for such presence is unlawful, and the behest of the statute that it be remitted within the sixty days must be given full effect to terminate the jurisdiction at that time notwithstanding a disobedience thereof by the clerk. In such case, while the record may be here physically, it is not lawfully here. *Pringle v. Dunn,* 39 Wis. 435, 442. Nor do we suggest that any irregular or unlawful departure of the record from our files can have any effect. The unlawful or unauthorized act of the clerk in transmitting it would be as inefficient as his unauthorized act in retaining it. *Rowland v. Kreyenhagen,* 24 Cal. 52; *Vance v. Peña,* 36 Cal. 328.

We have not overlooked the position now apparently adopted in New York, that although all appellate jurisdiction of the cause is lost by the filing of the *remittitur* in the lower

court, and that court thereupon vested with complete jurisdiction, nevertheless the appellate court may recall the record and re-assume jurisdiction in order to review its former decision. Cardozo, Court of Appeals, § 133; *Franklin B. N. Co. v. Mackey,* 158 N. Y. 683, 51 N. E. 178. It is, however, antagonized by holdings elsewhere and by the declarations of this court in the cases cited, and we do not find reason to justify its adoption.

Having reached the conclusion that we have no jurisdiction over the cause and can make no order either with reference to our judgment or with reference to the record, it is not very material to discuss whether otherwise this motion could or would be received by the court in defiance of our present Rule 42:

"No motion as to any final determination made by the court, except a motion to correct mistakes in the record of this court, will be heard unless made within thirty days after such determination."

Counsel contend that this does not apply to a motion of this sort, and predicate such contention upon what was said in *Hocks v. Sprangers,* 113 Wis. 123, 89 N. W. 113, as to Rules XX and XXI of the old rules. Rule XX of the old rules, like Rule 37 of the rules of 1906, applied to a motion for a rehearing, strictly so called, while Rule XXI, in its terms, applied to *any* motion, and, as said in *Hocks v. Sprangers, supra,* at page 138 (89 N. W. 115), the practice has become reasonably well established that neither excluded a motion in the nature of a motion for a rehearing, as one to modify our judgment or mandate, at any time while our jurisdiction persists. It was in view of that anomaly that present Rule 42 was formulated. By its language it clearly includes the present motion to modify the final determination of this court, and the policy embodied in that rule is that all motions of that character, like motions for rehearing, must be made within the thirty days during which, in all cases, the records

are required to be retained. True, such rules do not take away our jurisdiction, but they limit and regulate the right of the litigant to invoke the exercise of such jurisdiction as we may have. *Att'y Gen. ex rel. Cushing v. Lum,* 2 Wis. 507, 510; *Baker v. State,* 84 Wis. 584, 54 N. W. 1003; *Deuster ·v. Milwaukee St. R. Co.* 89 Wis. 191, 194, 61 N. W. 766. True, the absolutism of Rule 42 is qualified by present Rule 21 reserving to the court the power in a proper case and for cause shown to enlarge the time within which any act may be done. We need not, however, and probably should not, in this case discuss the question whether respondent has shown proper cause for indulgence under that rule, since we have determined that we are wholly without jurisdiction to entertain his motion.

*By the Court.*—Motion to recall the record from the circuit court is denied, with $10 costs.

SIEBECKER and TIMLIN, JJ., dissent.