## Melton v. Commonwealth.

(Decided November 5, 1914.)

### Appeal from Jefferson Circuit Court (Common Pleas Branch, First Division).

1. Contempt—Of Court—Defined.—Contempt of court is confined to acts or conduct amounting to disrespect of or indignity to the judge or court, or interference with or disobedience of the processes, orders or judgments of a court, or some obstruction of the due and proper administration of justice in a pending case, or some misconduct of an officer of the court.

2. Contempt—Power of Court to Punish for.—The power to punish for contempt is inherent in all courts. Its existence is essential to order in judicial proceedings and to the enforcement of orders, judgments and writs of courts, and consequently to the due administration of justice.

3. Contempt—Acts Not Constituting Contempt.—Where a physician, in contemplation of a pending suit by a party to recover damages for personal injuries sustained by the alleged negligence of another, treated the party in a professional way for the purpose of making evidence that would sustain the action that was soon afterwards brought, when he knew the party was not injured, he was not guilty of contempt, and could not be proceeded against or punished by contempt proceedings, although he might have been proceeded against and punished by indictment. If, however, in a pending suit a physician had been guilty of this conduct, it would be a contempt of court.

4. Contempt—Prosecution for Not. Bar to Indictment in Prosecution for the Same Offense.—There are some offenses that are at the same time contempts of court and indictable crimes, and in this class of cases punishment for contempt will not bar punishment under indictment for the larger offense.

5. Contempt—When Attorney or Officer of Court May Be Punished for.—An attorney or officer of the court who is guilty of conduct calculated to embarrass the court in the performance of its duties, or who attempts by improper methods to secure or suppress evidence or obtain favors by deceitful means, would be guilty of an offense punishable in a contempt proceeding, although this conduct or these acts were not committed in a pending case. A higher standard of duty is exacted of court officers than is demanded of others, and they might be guilty of contempt of court by committing acts that would not amount to contempt if committed by other persons.

6. Witnesses—Evidence—Prosecution for Securing False Evidence or Suppressing Evidence.—Where a person, in aid of a contemplated suit, endeavors to persuade a party that he has been injured by the negligence of another, when in fact the party has not been injured, and this is known to the person prevailing on him to say he is, such person is guilty of the common law misdemeanor of obstructing justice and may be punished for this offense by a fine in any amount or by imprisonment for any time or both by such fine and imprisonment. And this offense is complete when the person attempts by fraudulent methods to secure the institution of the suit, although it may never be brought.

BURNETT & BURNETT and A. P. DODD for appellant.

JAMES GARNETT, Attorney General and ROBERT T. CALDWELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

On May 26, 1914, the following information was filed in the Jefferson Circuit Court by the Hon. William H. Field, one of the judges of that court:

"Commonwealth of Kentucky, Plaintiff v. Arthur C. Popham, William H. Roose, Dr. Frank Melton, Defendants. Information. The Commonwealth of Kentucky, upon information based upon the statements of Clyde C. Collins, this day filed charges: That Arthur C. Popham and William H. Roose each is and each was at the times mentioned herein an attorney at law practicing at the bar of the Jefferson Circuit Court, being members of the firm of Popham, Trusty & Roose; that Dr. Frank Melton is a practicing physician of the City of Louisville; that on October 9, 1913, one Clyde C. Collins was driving a wagon of the American Ice & Cold Storage Co. which came into collision with an automobile of Grainger & Co. near the intersection of Eighth and Walnut Streets, and went into the drug-store at that corner for the purpose of telephoning; that while there, defendants, Popham, Roose and Melton arrived, coming without call or solicitation by said Collins; that said Collins was not injured, and so stated; that the defendants and each of them endeavored to persuade said Collins that he was injured; that defendants, Popham and Roose, told said Collins, in substance, that he could get 'a bunch of money' out of it; that defendants and each of them insisted upon said Collins submitting to examination, and that he was examined by defendant, Dr. Melton; that said Melton dis-

covered a small bandage worn by Collins as a result of a slight accident sustained the day previous; that, in spite of Collins' explanation, said Melton re-bandaged him, saying, in substance, that 'they don't know about that'; that subsequently Dr. Melton again bandaged Collins; that suit was subsequently filed by Popham, Trusty & Roose, in behalf of Collins, against Grainger & Co. The statement, under oath, of said Collins, is made a part hereof—Wm. H. Field, Judge.''

Accompanying this information was the verified statement of Collins in the form of a deposition in which he was asked and answered many questions, the substance and effect of his evidence being as stated in the information; and it was on the faith of this statement that Judge Field filed the information, upon which a rule issued from the circuit court against Popham, Roose and Melton. The rule against Melton cited him ''to show cause, if any he has or can, why he shall not be proceeded against for contempt of Court, as particularly set forth in information this day filed.''

In answer to this rule Melton appeared in court and filed a response in which, after averring that the charge made against him by Collins in his evidence supporting the information, and the charge contained in the information, was each false, he proceeded to say that on the occasion mentioned in the information and while he was engaged in a professional way in the vicinity of Eighth and Walnut Streets, ''he stopped at the drug-store at the corner of Eighth and Walnut Streets for the purpose of telephoning to his office; that while there he observed that there had been a collision or accident of some kind; and that when he entered the drug-store he observed two men, unknown to him, sitting in chairs and claiming to have been injured in the collision; that the clerk of the drug-store was at the time at the telephone, and turned to this respondent and said that the said two men had been hurt, and that he had been trying to call a doctor, that he had called up two doctors and had been unable to reach either of them, and asked this respondent to aid the two men.''

''Respondent says he did examine the said two men, who claimed that they were injured, and especially the said Clyde Collins; that said Collins at that time had no bandages or plaster on his back as is claimed in said statement, but did complain of pains in his back, and that in order to relieve the same this respondent, with

the assistance of the said clerk, and no one else, did first wash with alcohol the places claimed to be causing the pain, and then put over that place an adhesive plaster in order to limit the motions and use of the muscles in the neighborhood of the place where the said Collins claimed the pain came from.''

He further said ''that he is in no way, shape or form connected with the firm of Popham, Trusty & Roose, or any member of said firm; that he has not in this or any other transaction in any way employed said firm, or done anything to suggest or encourage their employment; that neither of them was present in the drug-store on the 9th day of October, 1913, when this respondent entered said drug-store for the sole purpose of using the telephone; that respondent did not have any knowledge or information whatever as to how said attorneys were called to the said drug-store or as to their business there; that all of the statements made in said affidavit and statement of Clyde Collins filed herein, connecting said firm of attorneys with respondent or that said attorneys directed respondent what to do, are absolutely false; that respondent received no instructions from said attorneys or either one of them; nor was he in any way guided or controlled in his treatment of Collins by directions from or the interests of said attorneys in the case.'' He also said ''that if the said Collins was not hurt, that he misstated the facts to respondent, and represented to respondent that he was suffering from pains in his back as above set out.''

It further appears from the record that Melton did not see or prescribe for Collins in a professional way, or give him any advice, or make to him any suggestions about his injury, after the suit was brought. That the acts committed by Melton, and on which the contempt charge was based, occurred before the suit was instituted, but were done in contemplation of the suit and for the purpose of sustaining it. That six days after the incident at Eighth and Walnut, a suit was brought in the Jefferson Circuit Court by Popham, Trusty & Roose, attorneys for Collins against Grainger & Co., to recover damages for the alleged injury. That this suit was assigned for trial in the division of the Jefferson Circuit Court presided over by Judge Field, but before coming to trial, was dismissed by Collins, and soon thereafter this rule was issued. That the attorneys, Popham and Roose, were disbarred. That Judge Field impaneled a

jury to try Melton, and the jury, after hearing the evidence and receiving the instructions, found him guilty and fixed his punishment at $500.

On this appeal by Melton, although several grounds are assigned why the judgment should be reversed, the principal one is that the prosecution and conviction of Melton on the information filed by Judge Field, and the rule issued thereon, was void, because Judge Field had no authority or jurisdiction to issue the rule or hear and determine the issues arising thereon.

This ground of reversal involves an inquiry into the power and jurisdiction of Judge Field to proceed against Melton for contempt on the state of facts shown in the information and supporting evidence, and if Judge Field was without jurisdiction to issue the rule and hear and determine the matter, the judgment of conviction was unauthorized and void.

The Jefferson Circuit Court is composed of seven branches or divisions presided over by seven judges, six of them having civil jurisdiction and one criminal jurisdiction. But these seven divisions constitute only one court; namely, the Jefferson Circuit Court, and these seven judges merely preside over divisions of that court. A contempt against the authority of any of these judges or courts would be a contempt against the authority of the Jefferson Circuit Court, and any of the judges or any of the courts would have jurisdiction to proceed against any person guilty of a contempt against the authority of any of the judges or any of the courts composing the Jefferson Circuit Court, although the contempt might not have been committed against the authority of the particular judge or particular court in which the proceeding for contempt was instituted and heard. It is, therefore, not material whether the particular offense here in question was committed by Melton against the authority of Judge Field or the division of the court presided over by Judge Field, because if it was a contempt against the authority of any of the other judges or any of the other courts, Judge Field would have jurisdiction to hear and determine the contempt proceeding.

So that the question for decision is, was the conduct of Melton such a contempt of the Jefferson Circuit Court as that he might be proceeded against by rule as for contempt, or was he guilty of an offense for which he could only be proceeded against and punished by the ordinary processes of the criminal law in the form of a warrant

such as may be issued under the authority of the criminal code or by indictment of the Grand Jury?

We assume and will hereafter show that Melton's conduct amounted to an offense that may be described as the common law misdemeanor of obstructing justice, for which he could be proceeded against and punished in the manner provided by law for the punishment of persons guilty of a common law misdemeanor, there being no statute in this State describing or defining this particular offense. But it does not follow from this that he could be proceeded against and punished as for contempt of court, as was done in the case we have.

Contempt of court is a very ancient offense, and, as we understand it, from the beginning has been confined to acts or conduct amounting to disrespect of, or indignity to, the judge, or court or interference with, or disobedience of the processes, orders or judgments of a court, or some obstruction of the due and proper administration of justice in a pending cause, or some misconduct of an officer of the court. It is generally divided into two classes known as direct and constructive, and Melton, if guilty at all, was guilty of constructive contempt.

In Blackstone's Commentaries, Book Four, page 283, this great law writer, in discussing particular offenses, speaks of contempt as follows: "To this head, of summary proceedings, may also be properly referred the method, immemorially used by the superior courts of justice, of punishing contempts by attachment, and the subsequent proceedings thereon.

"The contempts, that are thus punished, are either direct, which openly insult or resist the powers of the courts, or the persons of the judges who preside there; or else are consequential, which (without such gross indolence or direct opposition) plainly tend to create an universal disregard of their authority. The principal instances, of either sort, that have been usually punishable by attachment, are chiefly of the following kinds: * * * (2) Those committed by sheriffs, bailiffs, goalers, and other officers of the court by abusing the process of the law, or deceiving the parties, by any acts of oppression, extortion, collusive behavior, or culpable neglect of duty; (3) those committed by attorneys and solicitors, who are also officers of the respective courts; by gross instances of fraud and corruption, injustice to their clients, or other dishonest practice. For the malpractice of the officers reflects some dishonor on their employers; and, if

frequent or unpunished, creates among the people a disgust against the courts themselves; (4) those committed by jurymen, in collateral matters relating to the discharge of their office; such as making default, when summoned; refusing to be sworn, or to give any verdict; eating or drinking without the leave of the court, and especially at the cost of either party; and other misbehavior or irregularities of a similar kind; but not in mere exercise of their judicial capacities, as by giving a false or erroneous verdict; (5) those committed by witnesses; by making default when summoned, refusing to be sworn or examined, or prevaricating in their evidence when sworn; (6) those committed by parties to any suit, or proceeding before the court, as by disobedience to any rule or order, made in the progress of a cause; by non-payment of costs awarded by the court upon a motion. * * *

"Some of these contempts may arise in the face of the court; as by rude and contumelious behavior; by obstinacy, perverseness, or prevarication; by breach of the peace, or any wilful disturbance whatever; others in the absence of the court, as by disobeying or treating with disrespect the king's writ, or the rules or process of the court; by perverting such writ or process to the purposes of private malice, extortion, or injustice; by speaking or writing contemptuously of the court or judges, acting in their judicial capacity; by printing false accounts (or even true ones without proper permission) of causes then depending in judgment; and by anything, in short, that demonstrates a gross want of that regard and respect, which when once courts of justice are deprived of, their authority (so necessary for the good order of the kingdom) is entirely lost among the people.

"The process of attachment, for these and the like contempts, must necessarily be as ancient as the laws themselves. For laws without a competent authority to secure their administration from disobedience and contempt, would be vain and nugatory. A power therefore in the supreme courts of justice to suppress such contempts, by an immediate attachment of the offender, results from the first principles of judicial establishments, and must be an inseparable attendant upon every superior tribunal."

In Bouvier's Law Dictionary contempt is defined as "a wilful disregard or disobedience of a public authority."

In Bishop's Criminal Law, Vol. 2, Section 243, under the title of "Contempt of Court and the Like," it is said: "It is not possible for any judicial tribunal to fulfil its functions without the power to preserve order, and to enforce its mandates and decrees. And the common and apparently the only practical method of doing these things is by the process of contempt. Therefore the power to proceed thus is incident to every such tribunal, derived from its very constitution, without any express statutory aid. The doctrine is generally asserted in these broad terms, and is believed to be sound; the narrower doctrine, about which there is no dispute, is that this power is inherent in all courts of record."

And in Section 251 it is further said: "We shall look at the act constituting judicial contempt as committed, First, In the presence of the court: Secondly, In its absence by persons attached to it as officers; Thirdly, In its absence by persons attached to it as parties or as having had process served upon them; Fourthly, In its absence by other persons; Fifthly, In these several ways as against justices of the peace."

In Sections 257-262 the author describes the contempts that may be committed against the court in its absence by other persons, as abusing judge out of court, enticing away witnesses, improper conduct toward a juror, publications about causes pending, and disobedience to subpoenas.

In Ex Parte Robinson, 19 Wallace 505, 22 L. Ed., 205, the court said: "The power to punish for contempt is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders and writs of the courts, and, consequently, to the due administration of justice."

As further illustrating that it has been deemed proper and wise in this country to confine what are called contempts of court within limits affecting judges or courts, or proceedings in, or processes of a court, or affecting officers of the court, it may be said that it appears in this opinion that Congress has limited summary punishment for contempt to cases: "1. Where there has been misbehavior of a person in the presence of the courts, or so near thereto as to obstruct the administration of justice; 2. Where there has been misbehavior of any officer of the courts in his official transactions; and, 3. Where there has been disobedience or

resistance by any officer, party, juror, witness or other person, to any lawful writ, process, order, rule, decree or command of the courts.''

In Yates v. Lansing, 9 Johnson, 395 (N. Y.), 6 Am. Dec., 290, the court said: ''The right of punishing for contempts by summary convictions, is inherent in all courts of justice and legislative assemblies; and is essential for their protection and existence. It is a branch of the common law, adopted and sanctioned by our State Constitution. The discretion involved in this power is in a great measure arbitrary and undefinable; and yet the experience of ages has demonstrated that it is perfectly compatible with civil liberty, and auxiliary to the purest ends of justice. The known existence of such a power prevents, in a thousand instances, the necessity of exerting it; and its obvious liability to abuse, is, perhaps, a strong reason why it is so seldom abused. This power extends not only to acts which directly and openly insult, or resist the powers of the court, or the persons of the judges, but to consequential, indirect and contructive contempts, which obstruct the process, degrade the authority, or contaminate the purity of the court.''

In Rapalje on Contempts, Section 21, it is said: ''Criminal contempts are all those acts in disrespect of the court or its process, or which obstruct the administration of justice, or tend to bring the court into disrepute * * * such as acts of misconduct by attorneys or other officers, disobedience of subpoenas or other process, disturbance or insolent behavior in the presence or immediate vicinity of the court, and the like.''

In *In Re Fellerman,* 149 Fed., 244, the court said: ''Contempt of court involves two ideas—disregard of the power of the court and disregard of its authority. Disregard of power, in that lawful orders have not been obeyed; and disregard of authority, in that its jurisdiction to declare the law and ascertain and adjudicate the rights of the parties is hindered, prevented, or set at naught. Such conduct is an offense against the court as an organ of public justice, and may be rightfully punished on summary conviction, whether the act complained of be punishable as a crime on indictment or not. The offense may be double; so is the remedy and the punishment.''

In Johnson v. Commonwealth, 1 Bibb, 598, this court said: ''It seems to be an established principle of law

that one court cannot punish for a contempt committed against another court. Intimately related to this, is another sentiment, that one court cannot judge of a contempt committed against another. In fine, it seems necessary to the very existence of a court in the healthy exercise of its powers, that it should have exclusive jurisdiction to judge of contempts to its authority."

In Welch v. Barber, 52 Conn., 147, 52 A. R., 567, it was held to be contempt for a defendant in a civil action to procure a postponement of a trial upon the false representation that he was ill and unable to attend court.

In Smith v. Brown, 3 Tex., 360, 49 A. D., 748, parties and their attorneys who brought a fictitious suit were held to be guilty of contempt of court.

In Fisher v. McDaniel, 9 Wyo., 457, 87 A. S. R., 971, an attempt to bribe a witness in a pending case was held to be contempt.

To attempt to obtain information from a juror is a contempt: State v. Doty, 3 Vroon, 403 (N. J.) 90 A. D., 671. And so is an attempt to bribe a juror: Little v. State, 90 Ind., 338, 46 A. R., 224.

In Goodhart v. State, 84 Conn., 60, 23 A. & E. Anno. Cases, 1297, it was held that any act committed in the course of a judicial proceeding, with the intent to deceive the court, and which is calculated to impede or obstruct the court in its administration of justice is a contempt.

Many other cases might be referred to, but these are sufficient for the purpose of illustrating the principle expressed in the unbroken current of authority that contempt proceedings are confined to acts or conduct of attorneys, or officers of the court, or acts or conduct affecting the administration of justice in pending cases, or to some interference with the processes of the court, or obstruction of its orders or judgments, or to some indignity to, or disrespect of a judge or court. And a very diligent investigation has failed to discover any authority extending beyond these limits the power of a court to punish criminal contempt by summary proceedings.

In this State we have no statute describing with particularity what constitutes contempt of court, although in Sections 1291-1302, of the Kentucky Statutes, the subject of contempt is treated of. It appears, however, that in all the cases that have been written by this court on the subject, the contempt consisted of some indignity committed against the judge or

the court, or interference with its proceedings or processes, or grew out of the misconduct of some officer of the court: Philips & Walker v. Harrison, 3 J. J. Mar., 122; Arnold v. Commonwealth, 80 Ky., 300; In re Woolley, 11 Bush, 95; French v. Commonwealth, 30 Ky. L. R., 98; Gordon v. Commonwealth, 141 Ky., 461; Richardson v. Commonwealth, 141 Ky., 497. In some of these cases the proceedings were summary and the penalty inflicted by the judge; in others a jury was impaneled to assess the punishment.

We, therefore, think that Melton could not be proceeded against or punished in the manner appearing in this record. He was not an officer of the Jefferson Circuit Court. He did not commit any offense in the presence of the court, or interfere with the execution of any process, order or judgment issued by the court, or obstruct in any manner the administration of justice in a case pending in the court.

We are not disposed to concede that a judge of any court has authority to proceed in this summary way to punish persons not court officers who have not committed any offense against the judge or his court, and who have not interfered with or obstructed in any manner the processes or orders or judgments of his court, or the administration of justice there.

In all the history of the law there has been a special practice and procedure for the prosecution and punishment of persons guilty of criminal offenses, and this practice and procedure, with one exception, has always been applicable to crimes great and small. No matter who the offender or what the offense, he must be prosecuted and punished according to and under the rules and forms by and through which the criminal law is administered in all cases and in all courts.

The only exception to this is found in the prosecution and punishment of persons guilty of the misdemeanor known as criminal contempt. And this exception has been made so that a court of justice might, in a summary and expeditious way, punish those who offended against its authority. The exception was not made because criminal contempt was not an offense that might be punished under the practice and procedure applicable to criminal cases, for perhaps without exception all cases of criminal contempt may be so prosecuted and punished—but in order that a court might at all times have the inherent power to preserve its dignity and vindicate its authority

without the delay necessarily incident to the prosecution of offenders generally.

But this method should, as we think, be limited to the class of offenses to which it has always been confined. There appears to us no good reason why it should be extended to cases not within the fair scope or purpose of the exception. There are many common law offenses that fall within the definition of obstructions of justice or offenses against government, and these offenses should be prosecuted and punished according to the course of the common law when they do not involve a contempt of court as we have defined it. Nor do we think it consistent with a wise public policy, or in harmony with the spirit of the law as administered in this State and country, to invest judges with the power to summarily proceed, as by rule, against persons guilty of criminal offenses but who do not offend against the dignity or processes of the court, or with the conduct of pending cases, and who are not its officers. There seems to us no sound reason for making such a departure as this from the settled course of the law in criminal cases, and especially is this so when the procedure of the criminal law, as we will presently point out, furnishes adequate means by which offenders such as Melton was may be punished.

In thus speaking, we do not under value the importance of protecting courts or of keeping pure the administration of the law; nor do we think what we have said limits in any manner the power courts have always possessed to punish as for contempt persons who were guilty of contempt as it has been always defined. When a court has full power and authority to protect its dignity, enforce its processes, discipline its officers and punish those who would impede or bring into disrepute the administration of justice in a pending case, it has all the authority that is needed to be exercised through contempt proceedings, and other offenses should be left to be disposed of in the ordinary way.

If there had been a suit pending in the Jefferson Circuit Court and Melton had attempted to manufacture evidence in this suit, or had endeavored to persuade a witness to give false evidence or conceal the truth, or had in any manner or form interfered with the due administration of justice in the court in which the case was pending, we would have no doubt of the right of the court in which the case was pending to proceed against him in the summary manner adopted by Judge

Field in this case. Or if Melton had been an attorney or officer of the Jefferson Circuit Court, we would say that the court might proceed against him in the manner pursued in this case, as we think that an attorney or any officer of the court who is guilty of conduct calculated to embarrass the court in the performance of its duties, or who attempts, by improper methods, to secure or suppress evidence, or obtain favors by deceitful means, would be guilty of an offense punishable by a contempt proceeding, although this conduct or these acts were not committed in a pending case. A higher standard of duty is exacted of court officers than is demanded of others, and they might be guilty of contempt of court by committing acts that would not amount to contempt if committed by other persons. Attorneys at law and court officers, being a part of the court and charged in an especial degree with the duty of aiding the court in the correct administration of the law, it is just that the court should have much larger authority over them than it has over other persons.

Returning now to Melton, we think that although not guilty of a contempt of court, he yet committed a public offense; to-wit, the common law misdemeanor of obstructing justice, for which he might be proceeded against and punished in the manner provided for the punishment of persons guilty of common law misdemeanors. It is true that when he approached Collins and prevailed on him to subject himself to the treatment prescribed, Collins had no case pending in court, but, according to Collins' version of the affair, the purpose of Melton was to fraudulently make up a state of facts that would enable Collins to maintain a suit to recover damages for an injury that he had not sustained. And while it is true that Collins afterwards brought a suit to recover damages, yet we do not consider this circumstance of controlling importance. The offense of Melton was complete when he attempted by the methods described to induce Collins to bring a suit. His purpose was to prostitute the administration of the law and make the courts an instrument of fraud and wrong-doing. He was aiding and assisting in the institution of a suit that he knew was fraudulent and entirely unjustified by the facts, for the purpose of extorting, with the aid of and through the instrumentality of the courts, money from an innocent party.

Courts are established for the purpose of administer-

ing justice, but the object of Melton was to pervert this purpose by having them administer injustice and be the agency through which a fraud and a wrong might be perpetrated. Bishop in his Criminal Law, Vol. 1, Sec. 468, describes acts like this as an obstruction of justice, which is a common law offense, punishable by fine and imprisonment or both.

In Russell on Crimes, Vol. 1, page 182, it is said: "All who endeavor to stifle the truth, and prevent the due execution of justice, are highly punishable; and therefore the dissuading or endeavoring to dissuade a witness from giving evidence against a person indicted is an offense at common law, though the persuasion should not succeed."

In Commonwealth v. Reynolds, 14 Gray, 87 (Mass.), 72 A. D., 665, the court, in the course of an opinion defining indictable common law offenses having a tendency to obstruct the administration of justice, said: "And the 'due course of justice' means not only the due conviction and punishment, or the due acquittal and discharge of an accused party as justice may require, but it also means the due course of proceedings in the administration of justice. By obstructing those proceedings, public justice is obstructed."

In State v. Keyes, 8 Vt., 57, 30 A. D., 450, the court also said: "And the doing of any act tending to obstruct the due course of public justice, has always been held indictable as a misdemeanor at common law."

In Commonwealth v. Berry, 141 Ky., 477, we held that it was an obstruction of justice and an indictable common law misdemeanor to persuade a person to go beyond the jurisdiction of the court so that he might not be summoned as a witness before the Grand Jury, and in the course of that opinion it was said:

"The course of public justice must not be impeded. The gist of the offense is not a contempt of the court, or an abuse of its process, but the obstruction of justice. He who knows that another will be a witness, or has reason to know it, and so knowing, causes the witness to absent himself for the purpose of preventing his testifying, is guilty of obstructing justice, although the witness may not have been subpoenaed, or his testimony, if given, would not have been important. The law does not tolerate that its proceedings shall be stifled, and the running off of a witness to stifle a prosecution is

none the less an offense because it is done before the 'Grand Jury is impaneled.''

In the French case, *supra,* French enticed away a witness in attendance upon the court under its subpoena, and this undoubtedly was an interference with the pro- cesses of the court and a contempt of court. For this of- fense he was arraigned under a contempt proceeding and tried before a jury that assessed his punishment at five thousand dollars, and in the opinion affirming the judg- ment the procedure to be followed in this class of cases was carefully and thoroughly considered.

The Berry case and the French case illustrate the dif- ference between offenses amounting to what may be called an obstruction of justice, that must be prosecuted by indictment, and those that may be prosecuted under contempt proceedings. Berry, as said by the court, was not guilty of a contempt of court or an abuse of its pro- cess, but of obstructing justice not in a pending case or proceeding, and so committed the common law offense for which he was indicted; while French was guilty of obstructing justice in a pending case, and therefore committed a contempt of court, for which he could be and was prosecuted and punished in a contempt proceed- ing.

There are also aggravated offenses that may be contempts of court, and also indictable crimes, and punishment for contempt would not bar a prosecution by indictment for the larger crime; but it is not neces- sary to pursue further an inquiry into this class of of- fenses.

Melton was, under the evidence for the Common- wealth, guilty of the common law offense of obstructing justice, and for this offense he could have been indicted by the Grand Jury of Jefferson County and, upon his trial, if proven guilty, under the rules of law and evi- dence that obtain in criminal practice, the jury could have assessed his punishment at a fine in any amount or imprisonment for any length of time, or have both so fined and imprisoned him.

Being of the opinion that this course should have been pursued and that Judge Field had no power or jurisdiction to proceed by information and rule, the judgment is reversed, with directions to discharge the rule and set aside the judgment.

The whole court sitting. Chief Justice Hobson and Judge Hannah dissenting.

DISSENTING OPINION BY CHIEF JUSTICE HOBSON.

The facts of the case are these: While one Clyde Collins with two others was driving a wagon along a street of Louisville, an automobile owned by another person collided with the wagon, breaking it and throwing out the men in the wagon. They repaired to a nearby drug store, where Collins was telephoning to his employers what had happened and also telephoning to the owners of the automobile when the defendant, Dr. Melton, and two attorneys, came in, They at once proceeded to induce Collins to bring a suit against the owners of the automobile. He told them he was not hurt, but they insisted that he was. The doctor examined him and found an injury upon his back. Collins explained to him that this was due to a previous accident. The doctor replied that that didn't matter; they wouldn't know, and proceeded to bandage Collins up. After obtaining a contract from Collins for the bringing of a suit, the three departed. The suit was brought a day or two later, and the facts coming to the knowledge of the judge, the information set out in the opinion was filed against Dr. Melton, and the two attorneys.

The proof on the hearing leaves no doubt that a fraudulent conspiracy was entered into between the two attorneys and Dr. Melton to induce Collins to bring a fake suit, they telling him that he would get a large amount of money, and arranging so that they would divide it with him. A clearer case of a criminal conspiracy to corrupt the administration of justice cannot well be imagined. The judgment against the two attorneys has not been appealed from, and this appeal only questions the correctness of the judgment against their co-conspirator, without whose aid the conspiracy would have been impossible of execution.

It is well settled that courts have an inherent power at common law to punish any act, whether committed in or out of their presence, which tends to impair, embarrass or obstruct them in the discharge of their duties; and the legislature, while it may regulate the procedure, cannot fetter the power. (In re Shortridge, 37 Am. St. Rep. 78; State v. Judge, 40 Am. St. Rep., 282; Hale v. State, 60 Am. St. Rep., 691; State v. Circuit Court, 65 Am. St. Rep., 90; In re Knaup, 66 Am. St. Rep. 435; Bradley v. State, 78 Am. St. Rep., 157; State v. Fred-

lock, 94 Am. St. Rep., 932.) Many other cases are re-
ferred to in those cited.

Contempts are divided into direct and constructive
contempts, which are thus defined in 1 Chamberlain on
Evidence, Section 255:

"The administrative power and dignity of the court
necessarily involve the rights of punishing summarily
for offenses against justice committed in the immediate
presence and hearing of the judge, or so near as to in-
terrupt proceedings before him. These are called direct
contempts. An act by any person done in presence of
the presiding judge which shows disrespect for his per-
son or authority while acting in his official capacity is
an offense against the power and dignity of the court.
The judge needs no evidence; he is himself, in such cases,
the percipient witness; should pleadings be deemed ad-
visable, they may be of the briefest and simplest descrip-
tion.

"Constructive contempts on the other hand, may be
defined as those arising from matters not occurring in
court, but which tend to degrade or make impotent the
authority of the judge, or which tend to impede or em-
barrass the administration of justice. In dealing with
contempts not committed in the presence of the judge,
the offender must be brought before the court by a rule
or some sufficient process.

"In other words, while the power to punish in cases
of direct contempts and constructive contempts is the
same, the procedure is different; in cases of direct con-
tempt the court acts spontaneously and commits the of-
fender summarily; while in cases of constructive con-
tempts the court, on information, issues a citation to
the offender to show cause why he should not be pun-
ished for contempt. The information in a proceeding for
contempt is sufficient if it clearly apprise the defendant
of the nature of the charge against him, and no par-
ticular form is, in general, essential."

In Yates vs. Lansing, 6 Am. Dec. 290, as quoted in the
opinion, the court, speaking of the power to punish for
contempt, said:

"This power extends not only to acts which directly
and openly insult, or resist the powers of the court, or
the persons of the judges, but consequential, indirect and
constructive contempts, which obstruct the process, de-
grade the authority, or contaminate the purity of the
court."

The decisions on the subject are clear and harmonious. Not a dissent or contrary view is to be found anywhere.

In 9 Cyc, 5-6, direct and constructive contempts are thus defined:

"A direct contempt is an open insult in the presence of the court to the person of the presiding judge, or a resistance or defiance in his presence to its powers or authority.

"A constructive contempt is an act done not in the presence of the court, but at a distance, which tends to belittle, to degrade, or to obstruct, interrupt, prevent, or embarrass the administration of justice."

To same effect see 7 Am. & Eng. Encyc. of Law, 28, note 50 Am. St. Rep. 272-285; State v. Shepherd, 99 Am. St. Rep., 624; Burdette v. Commonwealth, 106 Am. St. Rep., 916. In State v. Ives, 60 Minn., 478, the distinction between direct and constructive contempts is thus very clearly stated:

"Direct contempts are those committed in the immediate view and presence of the court. They are punishable summarily by order of the presiding judge, who takes judicial notice of such contempts, acts upon his own motion, and upon facts within his own knowledge, based upon the words or acts of the accused, or both, said or done in his presence or hearing. No formal trial is necessary. The court simply makes an order without proof, reciting what occurred in its presence or hearing, adjudging the person proceeded against guilty, and fixing his punishment. G. S. 1894, Sec. 6157. This is an arbitrary power born of necessity, which must be exercised with great prudence and always limited to cases of direct contempts. Constructive contempts are those which are not committed within the immediate presence of the court, but arise from matters not transpiring in court, but at a distance, of which it has no knowledge except as informed by others. While constructive contempts are punishable equally with those which are direct yet the procedure in the two cases is radically different. They cannot be punished summarily, but the court must be informed of the facts constituting the alleged contempt by affidavit or other evidence."

In 2 Bishop on Criminal Law, after a discussion of the different kinds of contempt, summing up the matter in Section 261, the learned author says:

"On this question of contempts committed by per-

sons neither attached to the court, nor in its presence, we can discern no difference between those attached and those not, or between those present and those absent, other than arises from the very different degrees of ability to obstruct the working of the judicial machinery possessed by these differing classes. Since the whole doctrine of contempt of court grows out of the necessity for it to administer justice, the consequence must be that whenever any obstruction to its justice is laid before it, the judge must cause the same to be removed. And though ordinarily men in no way connected with the tribunal, either as officers or parties, cannot obstruct the course of its justice without going into its presence, yet circumstances may and do occur in which they can. If they take advantage of these circumstances, and do what tends directly to impede the course of justice, or to corrupt the justice itself, they should be dealt with summarily for the contempt.''

That the conspiracy of the defendants to have an action instituted upon grounds which were false, and which they knew to be false, carried out by the actual bringing of the suit, was the doing of that which ''tends directly to impede the course of justice and to corrupt justice itself,'' there can be no question. That the courts at common law had the power to protect themselves from false and fraudulent suits must also be admitted. In Coxe v. Phillips, Hardw. 237, Lord Hardwick held a fictitious action to be a contempt of court and committed the parties and their common law attorney. See also R. J. Elsaw, 10 Eng. Com. Law, 272; Henkin v. Guerss, 12 East, 247; Gibson v. Tilton, 17 Am. Dec., 306. These were cases of feigned causes of action, and if the bringing of such an action is a contempt, how much more a contempt is it to bring a fraudulent action for the express purpose of corrupting justice?

The authorities cited by the court do not conflict with those above cited. A long quotation is made from Blackstone's Commentaries, but it will be observed that Blackstone, among other things, says:

''Some of these contempts may arise * * * by anything in short that demonstrates a gross want of that regard and respect which, when once courts of justice are deprived of their authority, (so necessary for the good order of the kingdom) is entirely lost among the people.''

At the head of the discussion, after pointing out that

contempts are either direct or indirect, and introducing the words quoted by the court, he says:

"The principal instances of either sort that have been usually punishable by attachment are chiefly of the following kind."

It will thus be seen that he only undertakes to give the principal instances of either sort that have been usually punished. While Bishop uses in Section 243 the language quoted in the opinion, he also uses near the close of the discussion the language quoted from Section 261. Section 252 closes with these words: "Among the particulars" then follow a number of more common instances of contempt. In Section 257 he discusses contempts in the absence of the court by other persons, and he winds up this discussion by Section 261. Neither Blackstone nor Bishop undertake to enumerate all the things that may be a contempt of court. They only give the commoner instances, and they both show that they do not intend to enumerate all the things that constitute contempt. The other authorities cited by the court are to the same effect.

The court refers to the act of Congress limiting contempts of court. If that act did not change the common law rule there was no necessity for it. It is known of all men that the passage of the act was due to certain contempt proceedings had in the Federal courts previous to its passage. We have no such statute in Kentucky; the common law as it stood prior to the fourth year of the reign of King James I, is in force in this State. (Ray v. Sweeney, 14 Bush, 1). Sections 1291 and 1292, Kentucky Statutes, are as follows:

"A court shall not, for contempt, impose upon the offender a fine exceeding thirty dollars, or imprison him exceeding thirty hours, without the intervention of a jury." (Sec. 1291).

"In all trials by jury arising under this subdivision, the truth of the matter may be given in evidence." (Sec. 1292).

We have no other statute modifying in any way the common law applicable to constructive contempts such as this. The only limitation upon the power of the court to punish constructive contempts is that provided in Sections 1295 and 1299, Kentucky Statutes:

"No court or judge shall proceed by process of contempt or impose a fine against any person who shall, by words or writing, animadvert upon or examine into the

proceedings or conduct of such court or judge, by words spoken or writing published not in the presence of such court or judge in the courthouse during the sitting of the court. (Section 1295, Kentucky Statutes.)

"Nothing in this subdivision shall be construed to prevent any court, or judge thereof, from proceeding against any person writing or publishing a libel, or slanderous words, of and concerning such court or judge in relation to his judicial conduct in court, by indictment * * *." (Sec. 1299, Kentucky Statutes.)

All other constructive contempts are left as at common law except as provided in Sections 1291-1292 Kentucky Statutes, as to trial by jury and giving the truth of the matter in evidence. The common law being in force in this State, the question to be determined is not what this court, as now constituted, may think the rule on the subject ought to be; the sole question is what is the common law rule on the subject? When the common law rule is settled, it must, under the repeated decisions of this court, be followed until changed by the Legislature. What the common law rule is as to the punishment of constructive contempt such as that before us, is shown by a long, harmonious and clear line of decisions, beginning in the earliest times and extending down to our time. No decided case sustains the conclusion of the court and no text writer sustains it when all that he says on the subject is read.

Three reasons seem to underlie the opinion of the court.

1. The transaction at the drug store took place when no suit was pending.

A conspiracy is usually carried out by a succession of acts, and the nature of the conspiracy is to be determined by all that was done, and not by what took place on one occasion alone. The plastering up of Collins at the drug-store; the drawing of the contract by which the attorney was to receive a sum equal to one-half of the amount recovered, and the persuasion of Collins that he was injured and should bring a suit was the first step. This was followed by the actual bringing of the suit pursuant to the purpose of the conspiracy. Under a regulation in force in the Jefferson Circuit Court, suits are assigned to the different divisions in rotation, and this suit having fallen into the division presided over by Judge Field, the conspiracy culminated in the bringing of a false suit in his court. It is true that Dr. Melton did not

write the petition, and did not file it in the clerk's office with his own hands. This was done by his ally and fellow worker, the attorney; but Dr. Melton is as much responsible for the contempt as if he had filed the petition with his own hands; because it was all done by his associate pursuant to the plan mapped out between them and for the purpose of carrying out that plan. If A and B agree to kill C, and B loads a pistol and gives it to A, and A pursuant to the plan, kills C, B, though absent at the time of the killing, is equally liable as if he had fired the shot with his own hand. And so here as the original plan originally contemplated all that followed, and all that followed was done in pursuance of this plan to carry it into effect, Dr. Melton is equally responsible with the attorneys who were simply acting for him as well as themselves in what they did. After the suit was brought Dr. Melton, though he did not treat him professionally, directly and indirectly made efforts to get Collins to stand up to the action which had been brought and the attempt to foist the fraud upon the court. What he did at the drug store before the action was brought and what he did by himself and others after the action was brought, is all to be considered together; for it was part of one plan, and all done for one purpose.

This is a very serious case, and not without importance in the administration of justice. Hairsplitting distinctions should not be indulged to protect from punishment a man who is clearly guilty of an effort to corrupt public justice. Dr. Melton is a member of a learned profession. He did not act ignorantly, and it is especially important that the administration of justice should be protected against frauds devised by people of learning and position in the community. It is peculiarly important that the big fish should not escape the net of the law in which the little fish nearly always find themselves entangled.

2. Melton was not an attorney or officer of the court.

It is conceded by the court that the attorneys who filed the false suit were properly punished for contempt of court. While it is true that an attorney or other officer of the court is more reprehensible in a case like this than a third person, it cannot be maintained that the court has not power to protect itself against third persons in a case like this, by punishing a contempt committed by them. The attorney may be disbarred for unprofessional conduct, but conduct that is a contempt in

an attorney attempting to corrupt justice, is equally a contempt of court in a third person doing the same thing. Lord Hardwick made no distinction; he punished the parties as well as their attorney, and the precedent he set has never been criticised so far as I can find.

The same rule was followed in Lord v. Veazie, 8 How., 251. In Cleveland v. Chamberlain, 1 Black, 419, the appellant who carried on a pretended controversy by counsel whom he employed for the purpose of obtaining a decision injurious to the rights of third parties was held guilty of contempt. In like manner the bringing of a fictitious action to ascertain the legality of the issue of certain stock, was held a contempt of court (Smith v. Junction Railway Co., 29 Ind. 546), or the bringing of an action in the name of another person without his knowledge or consent (Butterworth v. Stagg, 2 Johns Cass. 291), or deceiving the court by falsely pretending to be sick (Welch v. Barber, 52 Am. Rep., 567), or filing a false answer (Martin Cantine Co. v. Warshauer, 28 N. Y. Sup., 139).

If the case referred to had come to trial and on the trial the facts had come to light, could it be maintained under the authorities above cited that Dr. Melton and his associates had not been guilty of contempt in bringing this fabricated action. And if this is true how can ie be maintained that they were not guilty of contempt in filing the petition and having the defendant in that action summoned to answer it? Has not the court power to protect its process from abuse for fraudulent purposes? Do not such abuses of the processes of the court destroy respect for it, no less than the bringing of a fictitious action or the use of the name of a party without his knowledge or consent?

The court says: "If there had been a suit pending in the Jefferson Circuit Court and Melton had attempted to manufacture evidence in this suit, or had endeavored to persuade a witness to give false evidence or conceal the truth, or had in any manner or form interfered with the due administration of justice in the court in which the case was pending, we would have no doubt of the right of the court in which the case was pending to proceed against him in the summary manner adopted by Judge Field in this case."

If this is true, how is the bringing of the suit to be distinguished from subsequent steps in the action? And the proof shows that Melton did not cease his activities

when the petition was filed, but continued in one way and another to try to get Collins to stand up to it.

In Commonwealth v. Berry, 141 Ky., 477, Berry was indicted for obstructing justice and it was insisted for him that he could not be punished because the witness, he ran off, had not been subpoenaed, and in answer to this objection the court said the gist of his offense was not a contempt of court. No other question was involved in the case; and yet this is cited to sustain the opinion of the court. The other cases relied on by it support its conclusion no more than that case.

Mr. Bishop as shown above also takes the same view. The cases are numerous where persons who fabricated evidence in pending suits have been punished for contempt; and certainly no sound distinction can be maintained between the fabrication of evidence in a pending suit, and the fabrication of evidence with a view to a suit and the immediate consummation of the plan by bringing the suit. The authority of the court and respect for it are as much destroyed in one case as the other. If the guilty parties may be punished for such conduct in a pending suit, how can it be maintained that their dismissal of the false suit shall purge the contempt and shield them from punishment for the contempt they committed before it was dismissed? Can "the purity of the court" be preserved if it has no power to protect itself from such frauds. If, as has been held time and again, the court has power to punish as a contempt the fabrication of testimony or the fabrication of a record, how can it be maintained that it has not power to punish as a contempt a deliberate fabrication of a case? If such bold attempts to pervert justice may not be summarily dealt with, how is the purity of the court to be maintained? Summary punishment in such cases is essential; the court is not powerless to protect itself without calling to its aid the grand jury; but under all the authorities has inherent power to punish such contempts which strike at the very foundation of the administration of justice.

3. The conduct of Dr. Melton may be punished under an indictment for obstructing public justice.

If this were a sufficient reason for dismissing this case it is safe to say few prosecutions for contempt of court could be maintained for corrupting public justice. If a witness is suborned to swear falsely, the person knowingly inducing him to do so may be indicted for subornation of perjury. If a record is changed, the person

so changing it may be indicted for forgery. If a witness
is persuaded to leave the State, and justice is thus ob-
structed, the person inducing him to leave may be in-
dicted for obstructing public justice. But the fact that
in any case a crime has been committed, does not pre-
vent the act being a contempt of court, and from being
punished as a contempt of court. The books are full of
illustrations. Bishop in Section 264 says, "Many acts
are both contempt of court and indictable crimes." In
Bradley v. State, 78 Am. St. Rep., 163, the court said:

"Nor does it make any difference that the same act
is indictable under the penal laws of the State. On this
subject Judge Seymour D. Thompson, in an admirable
article in 5 Criminal Law Magazine, says (page 155):
"The power of the courts in this regard being founded
in the principle of self-preservation, it does not at all
go to deprive them of it that the law has provided some
other mode for punishing the offender; it is quite im-
material that offense is indictable. Courts are not ob-
liged to trust the preservation of their dignity and au-
thority to such weak agencies as information, indictment,
and trial by jury, it may be, before some other tribunal
where the success of the prosecution and the conviction
of the offender may depend upon the zeal of a prosecut-
ing witness, or the State's attorney, or upon circum-
stances purely accidental."

In Fisher v. McDaniel, 87 Am. St. Rep., 971, the court
said:

"It is well settled that if an act is a contempt of
court, the fact that the same act is indictable as a crim-
inal offense does not take away the jurisdiction of the
court to punish the offender as for a contempt."

To same effect see Hale v. State, 60 Am. St. Rep.,
691, People v. Tool, 117 Am. St. Rep., 198, State v.
Faulds, 17 Mont. 140, Ex Parte Sabin, 131 U. S., 267,
McCarthy v. Hugo, 135 Am. St. Rep., 270.

The books are full of cases where publications in
newspapers have been punished as contempts in the ab-
sence of some statute such as 1295 Ky. St., although in
all these cases the publication might have been indicted
as a libel. (Chamberlain on Evidence, Section 243). They
are full of cases where the tampering with a witness or
the fabrication of evidence has been punished as con-
tempts, although in all these cases an indictment for ob-
structing public justice might have been maintained.
(Chamberlain on Evidence, Sections 246, 247, 248.) The

false swearing by a witness has been punished as a contempt, although the witness might have been indicted for perjury. (Chamberlain on Evidence, Section 249); also the intimidation of a witness and the suppression of testimony, advising a witness to leave and the like. (Chamberlain on Evidence, Sections 249-252.) This court has followed the same course in French v. Commonwealth, 30 R., 98. French was fined $5,000 for causing a witness to leave and the judgment was affirmed by this court, although clearly French might have been indicted for obstructing public justice. The same rule was followed in Arnold v. Commonwealth, 80 Ky., 300, where a like indictment might equally have been maintained, and where it was earnestly insisted that under the statute the defendant could only be punished by indictment. These two cases are not now overruled. But it is maintained that the court has no power to punish as a constructive contempt, the abuse of its process in a fabricated suit, although it has power to so punish the abuse of a subpoena in a real suit.

Though the acts committed by Dr. Melton constituted an indictable offense, still they may be punished as a contempt.

"A contempt is an offense against the court as an organ of public justice; and the court can rightfully punish it on summary conviction whether the same act be punishable as a crime or misdemeanor on indictment or not. A conviction on indictment will not purge the contempt; nor will a conviction for a contempt be a bar to an indictment. The offense may be double and so are the remedy and punishment." (Yates v. Lansing, 9 Johns (N. Y.) 417, 6 Am. Dec. 290, cited also in the opinion of the court herein.)

This is a well settled rule. 9 Cyc., 32 and cases cited: 7 A. & E. Enc. of L., 66 and cases cited; In re Fellerman, 149 Fed., 244 (cited in the opinion of the court); Arnold v. Commonwealth, 80 Ky., 300, 44 Am. Rep. 480; Hale v. State, 55 Ohio St., 210; 60 A. S. R. 691, 36 L. R. A. 254; Sherman v. People, 210 Ill. 552; Niches v. Judge, 130 Mich., 187, Rickets v. State, 111 Tenn., 380, Fisher v. McDaniel, 9 Wyo., 457, 87 A. S. R., 971; Bradley v. State, 111 Ga., 168, 78 A. S. R., 157; U. S. v. Debs, 64 Fed., 724; Chicago Directory Co. v. U. S. Directory Co., 123 Fed., 195, Ripon Knitting Works v. Schreiber, 101 Fed., 810; State v. Woodfin, 42 Am. Dec., 161.)

The sum of the opinion of the court is that the court

thinks it will be a better practice that offenses such as this should be punished by indictment rather than the summary process for contempt. It may be that the rule suggested by the court might be a proper one for legislative consideration; but by what power does the court establish it in the face of the common law authorities?

The slightest consideration of the origin of courts at common law will show that this never could have been the common law rule. At the first all litigants were heard before the King; the King heard litigants at court. As population increased, the King could not hear all litigants, and so he designated certain officers to hear them in his stead. The sittings of these officers were therefore called courts of our lord the King, the officers sitting as the representatives of the King and in his place. Any indignity to them was an indignity to the King. So it came about that to bring a feigned suit was a contempt of court, and it went without saying that a fraudulent suit would be a contempt; for certainly to knowingly attempt to foist a falsehood upon the King would have been regarded by him as a grave offense to his dignity; and what would be a contempt to the King would be a contempt to the officers sitting in his stead. In this way until this time the word "court" is used to designate the tribunal sitting for the hearing of causes; and these tribunals are protected now no less than they were originally by the power to punish for contempt.

For these reasons I dissent from the opinion of the court. Judge Hannah concurs in this dissent.